### PREMIER–PABST CORPORATION v. ELM CITY BREWING CO.
#### No. 2320.

District Court, D. Connecticut.
Jan. 28, 1935.

Edward S. Rogers, William T. Woodson, and James H. Rogers, all of Chicago, Ill., and Rockwell & Bartholow, of New Haven, Conn., for plaintiff.

William L. Hadden and George W. Crawford, both of New Haven, Conn., for defendant.

### HINCKS, District Judge.

Plaintiff's counsel has argued that the defendant's appropriation of the words "Olde Maestro" is an enjoinable appropriation of a property right in the plaintiff, in that it is an appropriation by a competitor of "advertising value" paid for by the plaintiff. But the meaning which is thus assigned to the phrase "advertising value" is so uncertain that I am unable to pass upon the validity of the claim. I prefer to treat it as an invitation to analysis.

That every man has a privilege for purposes of trade to use and publicize his own legal name or his own trade-name or soubriquet seems never to have been seriously questioned. Likewise, the privilege of using the name or soubriquet of another, if lawfully acquired from that other as by contract. The latter privilege, to be sure, is subject to the limitation imposed by public policy that no one shall use another's name in such a way as to deceive the public; and from this limitation springs the doctrine that a trade-name is not assignable in gross. But this limitation has no application to the present case, for there is neither claim nor basis for claim that the plaintiff in its employment of Ben Bernie, the "Old Maestro," to advertise and popularize its products, is creating any confusion in the public mind as to the source of the products thus advertised.

But is this privilege to use and publicize one's name or soubriquet something which may ripen into an exclusive right? If so, what is the source of that right, and what its definition? Although countless cases have arisen involving the existence of such rights, curiously enough we find comparatively little analysis of the nature and source of the right itself, but much comment on the acts and conduct which are alleged to have violated the right.

Thus, some have vaguely suggested that a right to a name may be a part of one's "good will" which is a subject-matter of property from which all others may be excluded. But such an assertion gets us nowhere. For "good will" itself is too loose and uncertain a quantity for aid in definition. As commonly conceived, it is a compound of many factors, and those factors chiefly associated with the concept seem to have little association with rights in a name. Thus value "as a going concern" is frequently considered as a part of "good will." But such value seems quite distinct from the value attributable to the right to a name. And again, good will is somewhat vaguely considered as the favorable regard of the purchasing public for a particular person, or for goods or services known to the public to emanate from a particular source; a regard founded (usually) on past dealings or reputation and of value in so far as it may be expected to produce further dealings. But good will so construed certainly is not property in any technical sense; for no man can have, either by prescription or contract, such a proprietary right to the favorable regard of the public that he may exclude others therefrom. Necessarily the relationship between a given manufacturer and the public and the regard of the public for that particular manufacturer is affected by the relationship between the public and others, particularly such others as may be competitors of that manufacturer. For instance, if producer B undersells producer A, other things being equal, presumably the public will come to have a less favorable regard for A. Likewise, if B advertises and sells the same product as A, but of a superior quality or with some particular improvement, the public may be brought, by its preference for B or his product, to have a less regard for A. The value of A's good will may thus be seriously impaired; yet no one will contend that, at least under the unwritten law, A's rights have been violated. Indeed, it has been fundamental in the philosophy of the common law that it is by just such a process that progress comes.

Nor does it serve to say that a right to a name has value; and therefore it is a property right within the protection of the law. This is to argue a priori. To be sure, a right may have value if it exists. But the question still remains, Has the right an existence cognizable in the law?

█ And so we are brought back to fundamentals. What is a right under the unwritten law? Nothing but a claim acknowledged as a well-founded claim by the experience of society which is the essence of the common law. Bouvier, Right. And this broad relationship has received classic analysis by Blackstone, 1 Com. 124 et seq., into the absolute and relative; the absolute rights comprising the right to personal security, the right to personal liberty, and the right of property. In this classification is there room for a right to the exclusive use of a name?

It is difficult to perceive that such a specific right is a property right within the scope of this classification. But it should be noticed that even in Blackstone's time the right to reputation was considered as an inherent part of the absolute right of life. He says, 1 Com. 134: "The security of his reputation or good name from the acts of detraction and slander, are rights to which every man is entitled, by reason and natural justice; since without these it is impossible to have the perfect enjoyment of any other advantage or right."

But before one can have a good name, he must have a name; before he can build a reputation, he must have an identity to which that reputation may attach. And so, if indeed reputation is a matter of right, to be known as a particular individual is a right even more fundamental. Conceivably, some alien civilization might exist wherein each member of society was consigned to perpetual anonymity; wherein each was doomed to live and die as one ant in the hill, or as one cog in the machine of the state, without means or right for any identification of personality. But the common law has more nobly appraised the fullness of human life; and in its recognition of a man's right to enjoy the good repute which he has earned, it has from ancient times implicitly recognized his exclusive right to the identity which he has established for himself among his fellows and in the public eye. And this is the right, I think, which has been the subject-matter of countless cases of unfair competition, so-called.

In a simpler society, perhaps, the right was seldom differentiated from other human rights because seldom challenged. It had value only to its owner. But as a competitive economy emerged from the guild system, the commercial value, indeed, the necessity, of names as a means of identification came to be recognized; and by use, at first of trade-marks, the right to the exclusive use of a specific means for identification, was extended to include the goods of the individual as well. And later, when the so-called doctrine of secondary meanings was established whereby the law came to recognize the acquisition of rights in the use of geographical and generic names for limited purposes of trade, no new right was born. The law simply recognized that in society as it had developed a man who had come to be identified by the public for specific goods through some specific association was entitled to the exclusive use of such means of identification. Others, to be sure, were free to compete with him; to wrest from him the favorable regard of the public, if they could. But his right to be known as he was known was his right of identity, and against all improper threats the subject-matter of equitable protection.

This tendency of the law has been accelerated by the trend of modern society. The obvious advantages of a system of mass production can only be obtained by a distribution of goods on a national scale. This in turn requires a system of national advertising. To meet this need, every conceivable instrument and method of advertising has been utilized. As a result, it lies within the observation of all that a producer can, with the aid of successful advertising, obtain for himself and his product public recognition of national dimensions, comparatively over night. But the right to establish and enjoy such recognition, as I see it, is nothing but a development of the ancient common-law right of a man to have such an identity in the public eye as he can win by his conduct and personality. And whether this right be classified as an absolute right or as a development of some relative right attaching to the relationship between competitors, is unimportant. It has been recognized as a right by society and has the protection of the law. I think Justice Holmes meant just that in his dictum in International News Service v. Associated Press, 248 U. S. at page 247, 39 S. Ct. 68, 75, 63 L. Ed. 211, 2 A. L. R. 293, when he said that: "The only reason why it is

actionable to make such a representation [i. e., a misrepresentation as to the source of goods] is that it tends to give the defendant an advantage in his competition with the plaintiff and that it is thought undesirable that an advantage should be gained in that way." In other words, it is the experience of society that the advantages of a competitive economy are best subserved by a recognition of this right, and its correlative obligation, to control the relationship between competitors.

Since the nature of this right is such that its existence in fact depends upon a recognition by the public of the identity of a particular individual, any act or conduct which confuses the state of the public mind in this relation impairs the value of the basic right, and is a violation thereof. In earlier times, the right of identity most frequently was violated by downright misrepresentations by word ("passing-off" cases) or by conduct (wrongful appropriation of trade-marks); much as the early violations of the right of reputation was by words slanderous per se. But in the march of commerce, skulduggery seems to have kept abreast of science in inventiveness, so that new and more subtle means were found to violate the right of identity by introducing confusion into the public mind, much as sly innuendoes were substituted for cruder words wherewith to sap and destroy reputations. On the whole these subtleties have found small favor with the courts, and it is now at least well established that any act or conduct which confuses or tends to confuse the public mind in relation to the identity of the plaintiff or his products is a violation of the plaintiff's right.

I see nothing in these conclusions inconsistent with the current of authority. To be sure, in many cases of unfair competition it has been said that fraud is the gist of the action. That is so because if A has established an identity for himself in the public mind anything done by B which leads the public to mistake him for A necessarily is deceitful and violates A's right. But if A has not succeeded in the acquisition of an identity in the public eye, necessarily no act of B's can operate to deceive the public in its identification of A; and A suffers no wrong because he has no legal right that is susceptible to legal injury.

Nor are the views expressed above justly subject to the criticism that their effect is to penalize innocent conduct by defendants. For notwithstanding protestations and denials, a chancellor will not readily believe that one entering and operating in a competitive field did so in ignorance of the presence of competition. And if it once appears that the newcomer approached the field with knowledge of the existence of competition, under the familiar maxim that a man is deemed to intend the natural consequences of his acts, he is bound to know whether his own conduct will violate any established right of his predecessors in the field. To be sure, on occasions he may plausibly protest that the plaintiff's claim of an established identity is based, in part at least, on associations disseminated in the public mind so indirect and subtle that he was unaware of their existence or of their effect. But by and large, human psychology seems to be such that the public mind, in so far as it depends for a particular identification upon indirect and subtle associations, is susceptible to confusion not through the blunt, forthwith acts of honest competition, but rather by kindred associations and suggestions similarly indirect and subtle. Consequently, when we find a newcomer in the field claiming to build for himself an identity depending upon subtle associations which in fact impinge upon those already established by the plaintiff, protestations of innocent intent overtax the credulity.

Because in every civil case the wrongfulness of the defendant's conduct depends upon the nature and scope of the plaintiff's right, it follows, of course, that a line of conduct wholly proper and innocuous in one set of circumstances, and with respect to one particular competitor, may be wholly illegal and injurious in another setting. The observation would seem to be obvious; yet strangely enough it is this simple truism that has caused so much confusion in what is called the law of unfair competition in bench, bar, and business. The honest business man, seeking to chart an honest course in perhaps a crowded field, learning that a certain piece of conduct has perhaps withstood the test of litigation from one source, concludes that substantially the same conduct is proof against all attack. The fallacy of such conclusions will be avoided if those honestly anxious fairly to judge a given situation will first define the plaintiff's right, or the right of every potential plaintiff. This done, it is a comparatively simple task to ascertain whether the conduct in question is such as to violate any such right thus found to exist.

It has been stated by eminent authority that in cases of unfair competition such conduct is wrongful as "shocks the judicial sensibilities." This, however, is observation upon the law, and not a statement of the law itself. For the law is said to be a rule of human conduct, and surely the honest but perplexed man of business (like the nisi prius judge) can derive little practical guidance from such an observation.

Instead, let the plaintiff's claim of right first be studied. Has he won for himself any specific public identification? Has he, by industry, by fidelity, by skill, or by personality, with or without the aid of advertising, so impressed upon the public mind his presence or his personality (or, indeed, the availability of his particular goods or services) that a member of the purchasing public in dealing with him, when the occasion should arise, would feel that he was turning to one not wholly a stranger? If the public or any substantial part of it has in fact come to recognize the plaintiff or his goods to that extent, the law will recognize the plaintiff's right to enjoy that public recognition and will proscribe all conduct tending to substitute confusion for recognition in the public mind.

To be sure, it is not always easy to determine whether in fact the plaintiff has won for himself or his goods any identity which the public recognizes. On this issue, individual members of the purchasing public are frequently called as witnesses and questioned as to their mental reactions. But such testimony, to me at least, is evidence of slight weight, for the average individual is seldom a reliable interpreter of his own mental reactions and content. Retailers or salesmen in contact with small sections of the public are perhaps more reliable witnesses of specific instances of confusion. But even the testimony of such witnesses, especially if associated with either party, is peculiarly subject to suggestion and bias. Not only that, but in view of the fact that modern advertising reaches millions, the chancellor, though he hear a hundred witnesses, can never know whether he has been shown a fairly representative picture.

After all, just as a state of knowledge in a given individual is best proven by inference from the surrounding facts, so the proof of a recognition by the public of the identity of a producer or his goods is necessarily a matter of inference. The evidence will show against the proper background what the producer has done to impress his identity or that of his goods upon the purchasing public; and from all the subordinate facts the trier will have to determine whether or not it follows with reasonable certainty that a public recognition of identity has in fact been achieved.

The sums spent in advertising, its scope, nature, and duration all are important factors, but not necessarily conclusive. After all, the issue is the achievement of an identity and not the effort expended in the attempted achievement. Nor is success in stimulating sales necessarily decisive. For, conceivably, such success may have resulted from methods of sales promotion having no tendency to create any specific association between the public and a particular producer. On certain phases of the issue, doubtless the opinions of experts in advertising and merchandising may be heard. But such testimony the trier will appraise, especially if it be disputed, in the light of his own common sense and in the last analysis reach his decision by applying his knowledge of human nature to the facts of the case.

If it is found that the plaintiff has thus established its right, ordinarily it will not be difficult to ascertain whether or not the defendant's conduct has violated that right. On this issue, also, the testimony of individual members of the public, of retailers, salesmen, and experts, is admissible, although, as I have suggested, seldom of controlling weight. Here again the trier will have to apply his knowledge of human nature to the defendant's conduct as proved and determine by inference whether the defendant has done anything tending to sap the virtue of any means of identification found to belong exclusively to the plaintiff. Has the defendant put out goods in such a way as to evoke in the public mind, by word, phrase, or image, an association attaching to the plaintiff or to some means of identification belonging to the plaintiff? If so, the tort is complete, and in the proper case enjoinable.

Applying these observations to the case at bar, we see that the primary issue here is not whether the plaintiff has acquired a public recognition of its identity in its own proper name. That fact, I take it, is not disputed; in any event it is amply established. The real question is whether the plaintiff, through its employment of Ben Bernie, has created in the public mind an association with the "Old Maestro" which

serves as a means to accentuate the identity of the plaintiff or its products. To be sure, there is no evidence showing what proportion of its sales, if any, is due to the advertising by the "Old Maestro." And the direct evidence is far from sufficient in itself to prove the existence of the association in the public mind. Nevertheless, the evidence relating to the nature, scope, and duration of the plaintiff's radio advertising, coupled with the evidence of its popularity, convinces me that the radio public is numerically a substantial part of the beer-purchasing public, and that it necessarily, human nature being what it is, in substantial part has become impregnated with a conscious or subconscious association between "Old Maestro" and the plaintiff's products.

That being so, the defendant's use of "Olde Maestro" as its trade-name necessarily tends to confuse the public and to destroy the effect of a means for identification which, at least in relation to the manufacture and distribution of malt products, belongs exclusively to the plaintiff.

The foregoing makes it unnecessary for me to make findings or conclusions upon the plaintiff's claim of infringement of its registered trade-mark.

A decree for the plaintiff, with costs, may be entered accordingly.

Note. Decree in this matter was entered pursuant to the foregoing opinion on January 28, 1935; the plaintiff waiving an accounting and the defendant waiving an appeal.