The nationally known "Toots Shor Restaurant," at 51 West 51st Street, New York City, is owned and operated by the complainant. It was established in April, 1940, by Bernard Shor, nicknamed "Toots" when he was a boy in Philadelphia, and still best known by that pseudonym.
The "Toots Shores" restaurant on the Boardwalk, opposite the Steel Pier, in Atlantic City, was opened by the defendant in January, 1946. Immediately, Bernard, or "Toots" Shor of New York received many letters referring to the Atlantic City restaurant and criticising what was assumed to be his action in opening and conducting a branch unworthy of the character and reputation of his New York establishment. Upon receipt of these letters the complainant notified the defendant to cease the use of his imitation of the complainant's trade name. The notice was ignored; the result, this suit.
The complainant seeks an injunction prohibiting the defendant from conducting his present or any other restaurant or food-selling business, under the name "Toots Shores" or under any name similar to "Toots Shor." The defendant concedes the great similarity of his trade name to that of the complainant, and that it was employed subsequent to the creation and use of the complainant's trade name. He contends, however, that he has not been guilty of "unfair competition" because his restaurant is operated in a territory different from that in which the complainant operates, and because he caters to a class of people other than that from which complainant draws its patrons.
Counsel for the complainant suggests that the principles stated in the conclusions filed by me in the recent cases of J.B.Liebman Co., Inc., v. Leibman, 135 N.J. Eq. 288;38 Atl. Rep. 2d 187, and Weiss v. The Stork and Gift *Page 158 Shop, 137 N.J. Eq. 475; 45 Atl. Rep. 2d 688, are dispositive of all the questions herein agitated. This is true but some of the defenses advanced in the instant case were not suggested in either the Liebman or the Weiss Case. In theWeiss Case, the junior competing business was opened almost directly opposite the store of the complainant, and there was actual and aggressive competition in merchandising the same type of goods. In the Liebman Case, there was like competition and, although the principal store of the senior was located in Philadelphia, Pennsylvania, and the store of the junior was opened in Camden, New Jersey, the senior had, over a period of years, developed and maintained an extensive trade with hundreds of customers in Camden.
Law is not static; it is an ever developing science. Under some of the earlier and most of the more recent decisions in our federal and our state courts, in actions based upon unfair trade practices, actual competition between the litigants has not been held to be an indispensable prerequisite to injunctive relief.Annotation, 148 L.R.A. 22, and collected authorities;52 Am.Jur., Trade-marks, Trade Names, c., §§ 93 and 109;Restatement of the Law, Torts, Introduction to ch. 35 pp. 537,540. The modern view was trenchantly expressed in Vogue Co. v.Thompson-Hudson Co. (1924) (C.C.A.), 300 Fed. Rep. 509,512: "This rule [that one should not be permitted to pass off his goods as those of another] is usually invoked when there is an actual market competition between the analogous products of the plaintiff and the defendants, and so it has been natural enough to speak of it as the doctrine of unfair competition; butthere is no fetish in the word `competition.' The invocation ofequity rests more vitally upon the unfairness. If B represents that his goods are made by A, and if damage therefrom to A is to be seen, we are aware of no consideration which makes it controlling whether this damage to A will come from market competition with some article which A is then manufacturing orwill come in some other way. The injury to A is present, and thefraud upon the consumer is present; nothing else is needed. * * *the same considerations *Page 159 which make the misrepresentation so valuable to defendants makeit pregnant with peril to plaintiff." (Italics mine.)
In Hanover Star Milling Co. v. Metcalf, 240 U.S. 403;60 L.Ed. 713, the Supreme Court of the United States, had before it two cases involving questions of unfair trade practices and of the territorial extent of the right in a trade name. Mr. Justice Pitney, speaking for the court, said "Courts afford redress or relief upon the ground that a party has a valuable interest in the good will of his trade or business, and in the trade-marks adopted to maintain and extend it. The essence of the wrong consists in the sale of the goods of one manufacturer or vendor for those of another. * * * Into whatever markets the use of atrade-mark has extended, or its meaning has become known, therewill the manufacturer or trader whose trade is pirated by aninfringing use be entitled to protection and redress." (Italics mine.)
The case nearest in point of fact to the instant case is StorkRestaurant, Inc., v. Marcus (U.S.D.C.) (E.D., Pa.), 1941,36 F. Supp. 90. In that case the plaintiff brought suit to protect the trade name of its restaurant. "The Stork Club," in the City of New York. That name had been continuously used by it for several years, and, with its restaurant, had been advertised extensively by various methods and through various media. It had also been referred to in various periodicals and other printed matter of local and national circulation, and the favorable publicity given the restaurant had attracted to it persons of prominence in social, literary, artistic, professional, commercial, official and cinematic circles. Then, the defendant registered in Pennsylvania the trade name "The Stork Club" to designate a restaurant he was opening in Philadelphia, and widely advertised its opening and operation. The court held that the defendant had not deprived the plaintiff of any patrons, but was profiting from the fame and repute adjunctive to the name and insignia of the plaintiff's restaurant and, that the defendant's business, although fundamentally similar to that of the plaintiff, was of such type that the reputation likely to be accorded to his business would differ materially from the reputation *Page 160 
of the plaintiff's restaurant. The court said: "It is generallyrecognized to-day that the emphasis in cases concerningtrademarks, trade-names, and `unfair competition' is no longeron competition, but rather on the injury suffered by theplaintiff and the public, it being enough if the defendant's acts result in confusion or deceit of the public. * * * Because an attractive, reputable trade-name can be imitated not for the purpose of diverting trade from its owner, but rather for the purpose of securing some of the good will, advertising, and sales stimulation appurtenant to it, the interest in a trade-name came to be protected against being subjected to the hazards ofanother's business not in actual competition. Restatement of theLaw of Torts, § 730, comment (a). That is, one's interest in a trade-name came to be protected against simulation not only in a competing business, but in a business so related to that of the owner of the trade-name that the possible ill repute of theother would be visited upon him." (Italics mine.)
The insistment of the complainant is that its established and nationally known trade name is being belittled and depreciated in value by the defendant's use of a name so similar as to confuse the complainant's customers and the public and lead them to believe that his small restaurant is a branch of the complainant's restaurant or controlled by it. Also, that the defendant deliberately pirated the complainant's trade name in order to deceive complainant's customers and the public and to advantage himself from its fame and good repute.
The New York restaurant features waiters and head waiters in evening dress, and the best of foods and beverages; the Atlantic City restaurant occupies a narrow room, the tables are crowded together, there is waitress service, intoxicants are not served and the food specialties are salads and sandwiches. Atlantic City and New York are both cities almost continuously crowded with tourists.
The defendant cites and relies upon the case of NationalGrocery Co. v. National Stores Corp., 95 N.J. Eq. 588;123 Atl. Rep. 740. In that case Vice-Chancellor Bentley *Page 161 
quoted from 37 Cyc. 760: "`Of course, there must be actual competition before there can be any unfair competition.'" The decree he advised was affirmed by our Court of Errors and Appeals, 97 N.J. Eq. 360; 127 Atl. Rep. 925, and has been cited in three subsequent decisions, Blue Goose Auto Service, Inc., v. Blue Goose Super Service Station, Inc., 110 N.J. Eq. 438;160 Atl. Rep. 836; Peerless Laundry Co., Inc., v. Peerless ServiceLaundry, Inc., 111 N.J. Eq. 221; 161 Atl. Rep. 832, andBaltimore v. Clark, 131 N.J. Eq. 290; 25 Atl. Rep. 2d30; 132 N.J. Eq. 374; 28 Atl. Rep. 2d 169. As I read the opinions in these four cases they do not preclude relief in the instant case, in fact, the decision of this court in the latter case, is authority for the granting of an injunction in the instant case. In the National Grocery Co. Case, Vice-Chancellor Bentley declared that fraud, a necessary element to a case of unfair competition, as he said, had not been asserted or proved, and that the parties were so separated from each other territorially, and the character of their activities (cash and carry grocery stores) was such that "it was impossible for one to injure the other." In the Blue Goose Case, Vice-Chancellor Fallon found that there was no actual competition between the litigants. Significantly, he declared that there was no evidence before him which would warrant a finding that the defendant had so conducted its business as to expressly or impliedly represent that it was the business of the complainant, or indicate that any damage, chargeable to the defendant, had been done to the complainant's business. In the Peerless Laundry Case, Vice-Chancellor Backes took care to point out that the defendant had a right to the use of its trade name, similar to that of the complainant, representing as it did a long established business which he had purchased. And, in Baltimore v. Clark, although Vice-Chancellor Bigelow repeated the quotation from Cyc., and found that there had been no actual competition between the parties, yet he advised an injunction, and this, despite the fact that the complainant had no intention of immediately using the trade name that he had purchased and was seeking to protect. The decree advising issuance *Page 162 
of an injunction was affirmed by the Court of Errors and Appeals,132 N.J. Eq. 374; 28 Atl. Rep. 2d 169.
In another case in this court, the questions of absence of direct competition, trade with different classes of customers and territorial separation, were raised; The Surprise Store v.Mintz, 1 N.J. Mis. R. 191. That case was disposed of orally and the Vice-Chancellor remarked that no simulation by the defendant of the appearance of complainant's New York store, or of its signs or advertisements, calculated to lead the public into thinking the defendant's store was operated by the complainant, or to mislead them to patronize the defendant's store in the belief that it was one of the complainant's stores had been proved. He also pointedly added that there had been no proof of fraud. He held that the use of the word "surprise" by the defendant in its trade name would not "result in probable injury to the complainant."
Likelihood of reliance upon the trade name of the junior user as representing manufacture or service of the senior, without actual reliance, is sufficient to subject one to liability for fraudulently marketing his goods or services as those of another.Restatement of the Law, Torts, ch. 35 § 712 f. And particularly is this true, where the use of the simulated trade name is unnecessary to the honest prosecution of the junior's business.International Silver Co. v. William H. Rogers Corp. (Courtof Errors and Appeals), 67 N.J. Eq. 646; 60 Atl. Rep. 187.
The early common law rule in actions for infringement of trade name, or for unfair competition, that actual competition between litigants must be shown as an essential prerequisite to relief, was formulated and promulgated in an age when national and international advertising, as we now know it, by radio, newspapers and magazines, was unknown, and when fast and convenient transportation by air, water and land was not habitually utilized by a people eager to visit and spend in distant cities. Here in New Jersey, and generally in the United States, it is now an accepted practice for housewives and wage-earners to use their automobiles to *Page 163 
patronize locally and nationally advertised mail-order houses, department stores, and "super markets" and, in recognition of this change of habit, such establishments are now being located outside of the congested business districts of our cities. Anyone who has recently passed such an establishment on a Friday (pay-day) afternoon or evening and noted the number and type of parked automobiles, and the variety of their licenses, must recognize the truth of this statement.
In the present suit the parties are in actual competition. Each is seeking to attract the ever-moving but ever-present tourist trade. The individual of this class visiting our eastern seaboard, and looking for a restaurant and good food in Atlantic City to-day may, and probably will, be in New York City a day or two hence pursuing the same purpose. Certainly residents of New York City frequently spend the week-end or their summer vacations in Atlantic City, and the fame and good repute of complainant's trade name and of its restaurant has extended to and beyond Atlantic City: Witness the flood of letters that came to Mr. Shor when defendant's restaurant was opened for business. But, proof of actual competition has never been deemed essential to the granting of relief when the imitator of a trade name acted in fraud. Cape May Yacht Club v. Cape May Yacht and Country Club,81 N.J. Eq. 454; 86 Atl. Rep. 972. And, the good or bad faith of the alleged infringer is an important factor on the territorial question. If he imitates the other's trade-mark or trade name knowingly and acts in other ways to convey the impression that his business is associated with the other, the inference may reasonably be drawn that there are prospective purchasers of the senior to be mislead. Restatement of the Law, Torts, ch. 35§ 732.
That the defendant intended to deceive the public is obvious. He had just lost his lease for a restaurant on the Boardwalk opposite Million Dollar Pier and had purchased the restaurant business which had long been conducted at his present location. For his new enterprise he did not choose to use the name of his old restaurant nor the name under which the purchased business had been operated. Instead, he determined *Page 164 
to advantage himself by using a simulation of complainant's trade name. The words most prominently displayed on the front of his restaurant were "Toots Shores" and these words were as prominently displayed in his advertising; when, in advertising, he noted his ownership and management, he did so in small type and at a place distant from his display of "Toots Shores."
Defendant's greatest deceit was his deliberate alteration of a photograph of the front of his restaurant for advertising purposes. He had contracted for the entire cover page of the brochure, "Amusements — Where to Go and What to See — Atlantic City," intended for free distribution to all visitors at the shore resort. Actually, beneath the words "Toots Shores," on the front of defendant's restaurant, appears the word "Sandwiches." But, in what purported to be a photographic reproduction thereof, one read these words: "Toots Shores Restaurant," and the defendant admitted that he personally persuaded his advertising agent to have the photographer blot out the word "Sandwiches" on the photograph and to substitute therefor the word "Restaurant." Thus, the defendant presented to the visiting public a restaurant bearing like name to that of the New York restaurant except for two added letters — and in sound those letters might well indicate the possessive case of the name "Shor."
The defendant's explanation, under oath, of his selection of the trade name "Toots Shores" was so absurd as to be unbelievable. He declared that he was not only engaged in the restaurant business but that he also conducted a real estate and insurance business; that his wife had assisted him in the other restaurant he had owned, and that he expected her to take most of the responsibility for the new restaurant; that he had always called his wife "Toots" and that the word "Shores" was but an indication that the restaurant was upon the sea shore.
On direct examination the defendant was asked when he registered the trade name "Toots Shores" in Atlantic County. He said that it occurred in November, 1945. Then, his counsel asked:"Q. Did you ever hear of Toots Shor restaurant *Page 165 in New York prior to this suit? A. No, sir." The Court: "Neverheard of it before this suit?" The witness: "No, sir." On cross-examination the defendant was asked whether he had any objection to using his own name, Bert Roland, to designate his new restaurant. His answer was: "A. I didn't have no objection to using it. May I explain why I did do what I did? After I opened this place, at least before I opened it, I found outthere was a Toots Shor in New York, then I started to put my own name on my advertisements and on the outside because I didn't care to deceive anybody. Q. You know it might deceive somebody? A. I didn't know it. Q. As a matter of fact, you didn't care to deceive anybody and that is why you put your name on the place? A. That was before I even opened the place." The defendant was then asked by the Court: "Q I understood you to say in your testimony, before you opened your restaurant youlearned there was a restaurant in New York? A. That is right,sir. Q. By the name of Toots Shor? A. Yes. Q. So that when you opened your restaurant you put your name on as owner-manager, did you? A. Yes." Then, on redirect examination, and after the conflicting testimony had been read aloud by the court stenographer, defendant's counsel asked the defendant: "Q.
Prior to your purchase of the Dewey Sandwich Shop had you heard of Toots Shor restaurant in New York? A. No, I had not. The Court: So you heard of it between October, 1945, the day whenyou purchased it, and the day of your opening, January 26th,1946? The witness: That is right. That is when I used my name." (Italics supplied.) This irreconcilable testimony, and the attitude of this witness upon the witness stand, left no doubt in my mind that he knew of the "Toots Shor Restaurant" in New York when he chose and first advertised a similar name for his new restaurant, and that he fully intended to deceive the public and benefit by the nation-wide, extensive and favorable publicity which the New York restaurant had enjoyed. Falsus in uno, falsusin omnibus.
The proof of the complainant was positive, definite, detailed and convincing. It introduced into evidence five books, *Page 166 
including the recent best-seller novel "The Hucksters" in which its restaurant in New York received favorable mention; four magazines, including Colliers and Esquire, in which friendly articles concerning the restaurant appeared; seven large scrap books filled with laudatory clippings and published photographs appertaining to the restaurant, and many original photographs depicting Mr. Shor, his restaurant, and celebrities being there entertained.
By close personal attention to the purchase, preparation and serving of foods and beverages, and intimate, friendly contacts with customers, Mr. Shor has attracted to the restaurant notable figures in the world of politics and of sports, stars of the stage and screen, authors, artists, news columnists and radio commentators. The reputation of the restaurant as the resort of epicures and celebrities has been broadcast throughout the United States. The gross annual business done at complainant's restaurant has attained a figure of $1,500,000, and the payroll runs from $7,000 to $7,500 each week. It is big business, nationally known.
The jurisdiction of courts of equity to prevent injury from infringement of trade names has been liberally exercised and applied in all circumstances whenever it appeared that the name was an established, distinctive and valuable adjunct to an undertaking, whether used to distinguish manufactured articles, a place of business, or a service. All that is required to bring into activity the injunctive powers of the court, is to inform it that the complainant's trade is in danger of harm from the use of its name, by the defendant, in such a way, as is calculated to deceive the public into the belief that the defendant's affairs, in the respect complained of, are those of the complainant. The test is, "Is the resemblance calculated to mislead or confuse to the complainant's damage?" Of course, if a fraudulent intent to deceive is present, the court will take hold, regardless of the consideration whether the defendant would otherwise have the right to use its name. Cape May Yacht Club v. Cape May Yachtand Country Club, supra.
The issuance of an injunction will be advised. *Page 167