**LONE RANGER, Inc. v. CURREY et al.**

*Civil Action No. 3062.*

District Court, M. D. Pennsylvania.

July 28, 1948.

Raymond J. Meurer, of Detroit, Mich., Stanley F. Coar and J. Julius Levy, both of Scranton, Pa., for plaintiff.

Paul A. McGlone and Frank J. McDonnell, both of Scranton, Pa., and Paul F. Gibbons, of Washington, D. C., for defendants.

MURPHY, District Judge.

This is an action for damages and an injunction based upon charges of unfair competition and unfair trade involving the alleged infringement of plaintiff's good will, trade-name, trade-mark and copyrights.

Plaintiff, The Lone Ranger Inc., incorporated under the laws of the State of Michigan, is a citizen and resident of that State; defendant Earl W. Currey is a citizen and resident of the State of Illinois; defendant "Jack" Smith is a citizen and resident of Pennsylvania.

Jurisdiction of this court is based upon diversity of citizenship and a dispute involving the required jurisdictional amount; similarly jurisdiction arises from Section 24(7) of the Judicial Code, 28 U.S.C.A. § 41(7). Personal service was made on each defendant in this district.

We have before us plaintiff's complaint, defendants' answer and counterclaim and the record of testimony as offered by plaintiff and defendants at a final hearing.

The uncontradicted evidence shows and we find as a fact the following :[1]

1. From the time of the first radio broadcast, January 30, 1933, over Station WXYZ, Detroit, and seven other Michigan radio stations, the Lone Ranger program has been broadcast, each script with but few exceptions being a complete episode, continuously three times weekly and has grown in coverage so that in 1948 it is broadcast over 179 stations of the Pacific and Blue networks and 67 additional stations in southeastern United States. The program appeals particularly to children. Commencing November 1933 the program has had various sponsors and is presently sponsored by General Mills Inc. and the American Baking Company.

2. From its first appearance, September 11, 1938, in the New York Journal American, the Lone Ranger comic or cartoon strip has increased its coverage so that in 1948 it appears through license arrangements with King Features Syndicate in 82 United States and 22 foreign countries' Sunday papers, and in 129 United States and 14 foreign countries' daily papers.

3. Republic Pictures have produced under license two movie serials portraying episodes of the Lone Ranger.

4. Since October 8, 1935, Whitman Publishing Company of Racine, Wisconsin, and Grosset & Dunlap of New York have under license published books of Lone Ranger adventure stories.

5. From July 12, 1938, by license Kilgore Manufacturing Company, an Ohio corporation, and other manufacturers, distributors and miscellaneous vendors have been permitted to sell various articles of merchandise identified as having some connection with the Lone Ranger.

6. Over four million children throughout the United States have been enrolled in the Lone Ranger Safety Club, four awards have been made for safety, two C.I.T. foundation awards. The purpose of the Club is to promote and foster good sound amusement, respect for parents, re-spect for law and order, and is especially devoted to the protection of life and limb.

7. Articles telling the story of the origin, rise and success of the Lone Ranger program have appeared in the Saturday Evening Post of October 13, 1939; Liberty Magazine of March 25, 1944; and Pic Magazine of May 5, 1945.

8. From the time of the conception of the Lone Ranger program by George W. Trendle of the Kunsky (now King)-Trendle Broadcasting Corporation, and the subsequent assignment of all rights therein to the plaintiff, incorporated by the State of Michigan January 31, 1935, to date, upwards of one million dollars have been invested in the creation, distribution, exploitation and advertising of the Lone Ranger, the characters and objects named in the program and all things incidental thereto.

9. To protect its trade-mark, trade-name and copyrights, the trade-mark was registered with the State of Michigan; the trade mark and articles of incorporation were registered with the United States Bureau of Patents. Each individual manuscript of the radio programs, comic or cartoon strips in the newspapers and comic books, all books published, as well as all forms used in connection with the Lone Ranger Safety Club, and photographs portraying the Lone Ranger in his distinctive mask and cowboy regalia, his horse Silver, and the Indian Tonto, have been noticed and copyrighted.

10. In every case where licenses have been granted the plaintiff has exercised strict and continuous supervision so that its aims and objectives of promoting law, good morals and safety may not be interfered with, and so that the high standard of quality and excellence of its product may be maintained.

11. The outstanding physical characteristics of the Lone Ranger episode story on the radio, in the movies, and in the comic and cartoon strips and books are the name "The Lone Ranger," the cowboy garb, the

---

[1] Rule 52(a) of the Federal Rules of Civil Procedure, as amended, 28 U.S.C.A. following section 723c. "* * * If an opinion or memorandum of decision is filed, it will be sufficient if the findings of fact and conclusions of law appear therein. * * *"

large hat, the mask, the silver trappings, the horse Silver, the unique cry or call "Hi Yo Silver" and "Hi Yo Silver Away," the little boy Dan Reid, and the Indian Tonto. Actually the Lone Ranger is a created fictional character, a mythical western cowboy. The words "Lone Ranger" do not describe any living person except insofar as such person might be employed to dramatize the literary property.

12. The aim of those who conceived the idea was to produce a show portraying life in the west between 1865 and 1890. The principal character rides about masked and on a white horse named Silver with a distinctive call "Hi Yo Silver" and "Hi Yo Silver Away," and with his Indian companion Tonto. The Lone Ranger's sole aim and purpose is to spend all his time championing, against tremendous odds, the cause of the oppressed, respect for law and order, honor and respect for parents, safety of children, and to be generally a force for good in redressing the wrongs of the community, and then disappear immediately from public gaze. Mystery was to be vital to his role; his identity was to be absolutely unknown. His character and actions were to be exemplary, his English perfect, his diction clear and distinct. No bad habits were to be portrayed; no smoking, swearing, gambling or drinking. His conduct was to be such as children would strive to emulate. In short, he was to become a popular hero and an idol of children. The name of "The Lone Ranger," the Indian "Tonto," and the phrase "Hi Yo Silver" and "Hi Yo Silver Away" have become by-words in the national vocabulary. The result is that the plaintiff has built up immense public good will and a business of great value.

13. All rights, title and interest in and to the dramatic literary composition "The Lone Ranger," including the title and names of characters and of the horse "Silver" and the distinctive cry "Hi Yo Silver" and "Hi Yo Silver Away," the mask, the cowboy regalia, silver saddle, and any and all adaptations thereof when used in conjunction are the sole and exclusive property of the plaintiff.

14. The only time the plaintiff authorizes the appearance of a person as "The Lone Ranger" at places outside the City of Detroit is on occasions of great importance, and then only under plaintiff's direct supervision and control, the agreement permitting the second party to advertise in a limited way.

15. Plaintiff has never bargained, sold, assigned or transferred any of its rights to anyone other than as hereinabove set forth.

16. Plaintiff has never bargained, sold, assigned, licensed, or transferred any of its rights to either of the defendants; nor has it ever given to the defendants or either of them any right to hold themselves out to the public as having any connection whatever with plaintiff or any of its rights herein described.

17. On three occasions plaintiff has successfully opposed other attempted registrations in the United States Patent Office of trade marks, two containing "Hi Yo Silver," another "Hio Ranger." By consent decree in Civil Action 160, the United States District Court for the Middle District of Pennsylvania on July 14, 1939, restrained one Lee Powell et al. from the improper use of the name "The Lone Ranger." Another phase of this matter was subsequently before the United States Circuit Court of Appeals for the Fourth Circuit, and the refusal of the United States District Court for the Western District of South Carolina, Lone Ranger v. Cox, D.C., 39 F.Supp. 487, to enjoin the defendant Lee Powell et al. from the improper use of the name "The Lone Ranger" was reversed. The proceedings are reported as Lone Ranger, Inc., v. Cox et al., 4 Cir., 1942, 124 F.2d 650.

We find as a fact from the credible evidence the following:

As to the defendant Currey—

Defendant herein asserts no claim to any of the rights, title, or interest of the plaintiff; admits he has no right to represent himself as the Lone Ranger; that he does not have a horse named Silver, Hi Ho Silver, or Hi Yo Silver, or the right to use the cry "Hi Yo Silver" or "Hi Yo Silver Away," and that he does not have an Indian companion named Tonto or Tonta.

Defendant first used the name "The Lone Star Ranger" at Houston, Texas, January

1940. When plaintiff complained that defendant's advance notices confused the newspaper, the Houston Post, and many of the general public into believing that defendant was the Lone Ranger, his Indian companion advertised as Tonta was Tonto, his horse advertised as Hi Ho Silver was Silver, the billing was immediately corrected to read "Capt. E. W. Currey and his Horses."

At San Antonio, Texas, in March 1947, the newspaper, the San Antonio Light, describing defendant as the Lone Star Ranger better known to light comic readers as the Lone Ranger, stated that enroute to Hollywood defendant would appear locally with his famous horse Silver. Plaintiff complained; the local advertising was corrected and defendant did not complete his engagement.

The pattern of confusion above described occurred in June 1947 in Muskegon, St. Josephs, Mt. Pleasant and Kalamazoo, Michigan, and later in various cities of the south, e. g., Macon, Georgia. In Muskegon plaintiff again complained; defendant again promised to refrain from his course of infringement.

In Charlotte, North Carolina, while this action was pending, defendant's newspaper notices, advertising and personal conduct caused public confusion. In a public parade and demonstration defendant so unmercifully beat his horse that protests were made by the Humane Society and other members of the public. Because of the unfavorable publicity concerning his disgraceful conduct defendant was discharged from the show. To protect itself plaintiff was obliged to advertise by newspaper and radio that defendant had no connection whatsoever with the Lone Ranger.

In this district—

Defendant followed the same pattern of deception and confusion as to advertising, newspaper notices and personal conduct at Sunbury, Lock Haven, Harrisburg, Wilkes-Barre and Scranton. His dress was an exact facsimile of the Lone Ranger in the copyrighted prints; he wore a wrist band bearing the legend "Lone * Ranger," which he showed when inquiry was made by anyone as to his identity; he gave autographs which by place, form and style were deceptive; his trailer bore the legend "Lone * Ranger, Hollywood, California"; on a piece of the stable equipment was painted "Lone Ranger"; his horse was called Silver; defendant told the Scranton Better Business Bureau manager that he was the original Lone Ranger and gave untruthful and deceptive reasons for the use of the term "Lone Star Ranger." Defendant represented himself as The Ranger, Mr. Ranger, L. S. Ranger, Louis Stone Ranger, Lone Star Ranger, Lone * Ranger, and Lone Ranger; represented that he had much experience on the radio and in the movies.

In court defendant vacillated and gave conflicting and contradictory answers as to his age, residence, union membership; presented pictures allegedly dated 1923 containing a likeness of himself with a 1939 model car in the background; stated that he had been presented with his saddle as a gift because of his standing in the entertainment field whereas in fact the saddle was purchased from the St. Louis Saddlery Company and despite demands is not yet paid for; stated he had been reported lost on Saipan as a member of the United States Intelligence Service, but when pressed said he was not telling the truth and was not in the United States Armed Forces in World War II at all; defendant presented a picture purporting to show him in his mask and regalia similar to that of the Lone Ranger, the picture being represented as of 1931 or earlier and as having appeared in the Chicago Tribune, whereas in fact the picture was from the Houston Post, Texas, January 17, 1940. In general neither the defendant Currey or the defendant Smith evidenced any desire to make a full and complete disclosure of their conduct.

Defendant Currey is and for sometime has been engaged in furnishing entertainment, particularly in rodeo shows.

Defendant Smith is engaged in the business of theatrical promotion and has been since July 1947 managing and booking agent for defendant Currey.

Time and again plaintiff requested defendant Currey to stop his course of infringement, but despite promises to com-

ply defendant persisted in his course of action.

## Conclusions of Law

1. The term "Lone Ranger" and the other terms used in conjunction therewith by the plaintiff have acquired a secondary meaning.

2. Plaintiff and defendants were in the business of furnishing entertainment to the general public.

3. Defendants attempted to pass their show off as being that of the plaintiff or as having some connection therewith.

4. Defendants attempted to unjustly enrich themselves by deceiving the public and by depriving plaintiff of the good will it had established.

5. Defendants resorted to cheating, fraud and deceit to defraud the public and to irreparably damage the plaintiff.

6. Defendants have unlawfully misled and deceived the plaintiff's customers and the public generally.

7. Defendants have attempted by wilful deception and fraud to divert the plaintiff's business, property and good will to themselves.

8. Defendants are guilty of unfair and inequitable trade practices and competition to the detriment of the plaintiff.

9. The conduct of the defendants and each of them has caused irreparable damage to the plaintiff.

10. Defendants' past conduct in the use of the name "The Lone Star Ranger" either by use of the *, or spelling out the word Star, has been such that neither of the defendants should be permitted to continue in the use of that name or the defendant Currey to wear the complete regalia similar to the Lone Ranger, or in the wearing of the mask, the use of the silver studded saddle, or the use of any words, terms or phrases which singly or in conjunction with others indicate or attempt to indicate in any manner whatsoever that defendant Currey is or has any connection whatsoever with the Lone Ranger.

11. Defendants should be enjoined from transacting business under the name "The Lone Star Ranger", or "The Lone * Ranger," or any other name which will include the plaintiff's trade name "The Lone Ranger" as an integral part thereof.

12. Defendants should be enjoined from imitating any or all of the distinctive and dominant characteristics of "The Lone Ranger" program, the cowboy garb and mask, the white horse named "Silver," the Indian companion "Tonto," the unique call "Hi Yo Silver" and "Hi Yo Silver Away," the silver studded trappings and the two guns worn by "The Lone Ranger."

13. Defendants should be enjoined from imitating the advertising of the plaintiff to the extent of using in defendants' advertising language containing the plaintiff's trade name "The Lone Ranger," or using the words "Lone" and/or "Ranger" as an integral part of their name in said advertising and to the extent of using in defendants' advertising pictures of a masked cowboy with any or all of the distinctive and dominant characteristics of "The Lone Ranger."

14. Defendant Currey should be enjoined from impersonating, acting, performing, dramatizing or otherwise portraying any or all of the distinctive garb and characteristics of "The Lone Ranger" aforesaid.

15. The defendant Smith should be enjoined from managing, acting as agent for, billing or advertising the defendant Currey in any manner whatsoever as to indicate that he is or has any connection with the Lone Ranger.

16. The court has no intention of preventing the defendant Currey from earning a livelihood as an entertainer acting as a cowboy, as a rider of horses, or performing stunts in rodeos or in circuses. We do however aim to preclude his doing so in any manner whatsoever which will amount to unfair competition or trade as to the Lone Ranger Inc.

17. A permanent injunction restraining the defendants from the conduct hereinabove outlined should issue.

## Discussion

■■■ Jurisdiction arises from diversity of citizenship, Jud.Code, Section 24(1), 28 U.S.C.A. § 41(1), and because questions of infringement of trade mark and copyrights are involved, Jud.Code, Section 24 (7), 28 U.S.C.A. § 41(7). Pennsylvania

196

and Federal law are in accord in holding in view of the findings of fact that defendants' conduct amounts to unfair competition and unfair trade and that a decree enjoining defendants' conduct should issue. Coca-Cola Co. v. Busch, D.C.E.D. Pa.1942, 44 F.Supp. 405; Safeway Stores, Inc., v. Sklar, D.C.E.D.Pa.1947, 75 F. Supp. 98; B.V.D. Co. v. Kaufmann & Baer Co., 272 Pa. 240, 116 A. 508, 509; Stroehmann Bros. Co. v. Manbeck Baking Co., 331 Pa. 96, 200 A. 97. Defendant Currey attempted to pass off his services as those of the plaintiff and practiced fraud and deceit as defined by the older cases. He has misappropriated plaintiff's trade name to confuse and deceive the public; unjustly enriched himself; diverted plaintiff's good will by way of future sales of its products and in a measure tended to lessen that good will by removing the mystery connected with the identity of the Lone Ranger. More seriously defendant Currey has in a measure lessened public confidence in the Lone Ranger by incidents connected with defendants' appearances at Sunbury and Charlotte and by his testimony in this court.

For the more modern view extending the coverage of situations in which conduct will be enjoined, see Champion Spark Plug Co. v. Sanders et al., 331 U.S. 125, 130, 67 S.Ct. 1136, 91 L.Ed. 1386; A.L.A. Schechter Poultry Corp. v. United States, 1935, 295 U.S. 495, at pages 531, 532, 55 S.Ct. 837, 79 L.Ed. 1570, 97 A.L.R. 947; See note 148 A.L.R. 12. For a history of the relief afforded under the heading of unfair competition and unfair trade, see Chafee, Unfair Competition, 53 Harv.L.Rev. 1289; Premier-Pabst Corp. v. Elm City Brewing Co., 1935, 9 F. Supp. 754, restraining the use of Ben Bernie's soubriquet "Old Maestro"; Ely-Norris Safe Co. v. Mosler Safe Co., 2 Cir., 1925, 7 F.2d 603, 604; California Apparel Creators v. Wieder of California, 2 Cir., 1947, 162 F.2d 893; Restatement of the Law of Torts, Section 715, 716 et seq.: Great Atlantic & Pacific Tea Co. v. A. & P. Radio Stores, Inc., D.C.E.D.Pa.1937, 20 F.Supp. 703; Rosenberg Bros. & Co. v. Elliott, 3 Cir., 1925, 7 F.2d 962 (Fashion Park Clothes); 51 West Fifty-First Corp.

v. Roland, 139 N.J.Eq. 156, 50 A.2d 369 (Toots Shor); Nims on Unfair Competition and Trade-Marks, 3d Ed., Section 9a.

 Where a defendant expressly and deliberately commits a fraud by representing that his goods or services are those of plaintiff, or that plaintiff is in some way connected with or interested in his business, equity will grant relief. Even in the absence of express and deliberate fraud equitable relief will be readily granted where there is shown bad faith on defendant's part, i. e., an intention of defendant to gain advantage from the reputation and good will of plaintiff's trade mark or trade name. Akron-Overland Tire Co. v. Willys-Overland Co., 3 Cir., 1921, 273 F. 674; Wall v. Rolls-Royce of America, Inc., 3 Cir., 1925, 4 F.2d 333; Kotabs, Inc., v. Kotex Co., 3 Cir., 1931, 50 F.2d 810, certiorari denied 284 U.S. 665, 52 S.Ct. 41, 76 L.Ed. 563; R. H. Macy & Co., Inc., v. Macy's Drug Store, Inc., 3 Cir., 1936, 84 F. 2d 387; Bond Stores, Incorporated, v. Bond Stores, Inc., 3 Cir., 1939, 104 F.2d 124; Stork Restaurant, Inc., v. Marcus, D.C. E.D.Pa., 36 F.Supp. 90 (Stork Club); 51 West Fifty-First Corp. v. Roland, supra; See note 148 A.L.R. 12, at page 41 et seq.; Rosenberg Bros. & Co. v. Elliott, supra.

 A fraudulent intention or bad faith will be inferred where the junior appropriator has knowledge of plaintiff's trade mark, trade name, or trade symbols and nevertheless deliberately copies such mark, or name or symbols. Akron-Overland Tire Co. v. Willys-Overland Co., supra; California Fruit Growers Exchange v. Windsor Beverages, Ltd., 7 Cir., 1941, 118 F.2d 149; Premier-Pabst Corp. v. Elm City Brewing Co., supra.

 The legal test of trade mark infringement is the same as the legal test of unfair competition and basically that test is the likelihood of consumer confusion as to the source of the goods. Coca-Cola Co. v. Snow Crest Beverages, Inc., 1 Cir., 1947, 162 F.2d 280, 283; Armstrong Paint & Varnish Works v. Nu-Enamel Corp., 1938, 305 U.S. 315, 325, 59 S.Ct. 191, 83 L.Ed. 195. The manufacturer or vendor is entitled to the reputation which his goods have acquired and the public to the

means of distinguishing between them and other goods; and protection is accorded against unfair dealing whether there be a technical trade mark or not. Skinner Mfg. Co. v. Kellogg Sales Co., 8 Cir., 1944, 143 F.2d 895, 899; Kotabs, Inc., v. Kotex Co., supra.

The use of a term which has attained a clear secondary meaning associated with a radio program will be enjoined as presumptively fraudulent where the defendant with knowledge of the plaintiff's activities under such a term appropriates the term for his own use in a closely related field, and creates confusion in the public mind. See note 171 A.L.R. 765, at page 779; Lone Ranger, Inc., v. Cox, 4 Cir., 1942, 124 F.2d 650; Town Hall, Inc., v. Associated Town Halls, Inc., D.C.Del.1941, 44 F.Supp. 315; Bamberger Broadcasting Service, Inc. v. Orloff, D.C.N.Y.1942, 44 F. Supp. 904 (W.O.R.); Premier-Pabst Corp. v. Elm City Brewing Co., supra.

Where the broadcasting station represented a recording as the actual broadcast in person of Paul Whiteman and his orchestra, it was held to be unfair competition in R.C.A. Mfg. Co., Inc., v. Whiteman, 2 Cir., 1940, 114 F.2d 86, certiorari denied 311 U.S. 712, 61 S.Ct. 393, 85 L.Ed. 463.

The law of unfair competition protects trade names used in radio broadcasting against unfair simulation. These are distinctly radio trade names, exploited and enhanced by radio broadcasting by means of which they have acquired their secondary meaning. The Lone Ranger indicates the origin of the production and proprietorship of the business, just as the name "Donald Duck" calls to mind Walt Disney, "Charlie McCarthy" the name of Edgar Bergen, "Amos and Andy" the names of Gosden and Correll.

Any doubt in respect to the extent of relief afforded must be resolved in favor of the innocent producer and against the one who has shown by his conduct that he is not to be trusted. Wm. R. Warner & Co. v. Eli Lilly & Co., 1924, 265 U.S. 526, 44 S.Ct. 615, 68 L.Ed. 1161; Champion Spark Plug Co. v. Sanders et al., supra. Similarly the character of the conduct of the defendant is relevant to the remedy which should be afforded.

Defendant cannot excuse his conduct by attempting to show that others are committing a similar wrong against plaintiff's trade name. Great Atlantic & Pacific Tea Co. v. A. & P. Radio Stores, Inc., supra.

As to the use of falsehood and fabrication in the presentation of a cause, see McHugh v. McHugh, 186 Pa. 197, 40 A. 410, 41 L.R.A. 805, 65 Am.St.Rep. 849; Allen v. United States, 1896, 164 U.S. 492, 17 S.Ct. 154, 41 L.Ed. 528; Wigmore on Evidence, 3d Ed., Section 278. Evidence of the misconduct of a party in connection with the trial of his case is admissible as tending to show that the party guilty of the misconduct is unwilling to rely on the truth of his cause.

The burden is on the defendant who uses plaintiff's trade name to justify the using thereof. Jacobs v. Beecham, 221 U.S. 263, 31 S.Ct. 555, 55 L.Ed. 729; Standard Oil Co. v. California Peach & Fig Growers, Inc., D.C.Del.1928, 28 F.2d 283. Defendant must show reasonable regard to the rights of the owner of such name or mark. Centaur Co. v. Genesh et al., D.C. W.D.Pa.1929, 33 F.2d 985; Vick Chemical Co. v. Strohmeier, D.C.E.D.Pa.1930, 39 F. 2d 89. The defendants have obviously not met this burden of proof.

Proof of similar acts of unfair competition warrant the conclusion that defendant is willing to continue his course of conduct, unless restrained. Wm. R. Warner & Co. v. Eli Lilly & Co., supra.

Plaintiff's complaint alleges each broadcast was copyrighted; that licenses were granted to vendors permitting the use of the trade mark, and that defendants' conduct amounted to unfair competition. Under Rule 54(c) of the Federal Rules of Civil Procedure, 28 U.S.C.A. following section 723c, all these grounds could be considered in granting relief. However, we feel plaintiff has made out such a strong case for relief under the heading of unfair competition that a discussion of the other matters in detail is unnecessary. Martha

Washington Candies Co. v. Goldstein, D.C. M.D.Pa.1938, 23 F.Supp. 861.[2]

Neither party has pointed to any difference existing between Pennsylvania and Federal law. See Kellogg Co. v. National Biscuit Co., 305 U.S. 111, 113 n. 1, 59 S. Ct. 109, 111, 83 L.Ed. 73; California Apparel Creators v. Wieder of California, Inc., 2 Cir., 1947, 162 F.2d 893. The specific acts of defendants complained of occurred in this district. See Zephyr American Corp. v. Bates Mfg. Co., 3 Cir., 1942, 128 F.2d 380, 386; Cridlebaugh v. Rudolph, 3 Cir., 1942, 131 F.2d 795. We have however considered defendants' acts throughout the United States to show a course of conduct, a pattern, to negative accident or mistake and generally on the question of infringement. Cf. Pecheur Lozenge Co., Inc., v. National Candy Co., 1942, 315 U.S. 666, 62 S.Ct. 853, 86 L.Ed. 1103; see generally note 148 A.L.R. 139, 160; Adam Hat Stores, Inc., v. Lefco, 3 Cir., 1943, 134 F. 2d 101; Bulova Watch Co., Inc., v. Stolzberg, 1947, 69 F.Supp. 543.

Plaintiff's advertising of names and phrases has resulted in their acquiring a secondary meaning, R. H. Macy & Co., Inc., v. Macy's Drug Store, Inc., supra, indicating origin and the name of the producer; being popular with children, they have stimulated sales. While the name could not be physically affixed to the radio program it was affixed to the manuscript used for that purpose.

In considering the nature of the relief to be granted we feel that defendants should be enjoined from any use whatsoever of the words "Lone Ranger" either alone or in conjunction with other words or symbols. Bernhard Ulmann Co., Inc., v. Wool Novelty Co., Inc., 167 Misc. 856, 4 N.Y.S.2d 97, 99; Northam Warren Corp. v. Universal Cosmetic Co., 7 Cir., 1927, 18 F.2d 774, 775. "Whether there is an infringement of a trade mark does not depend upon the use of identical words, nor on the question as to whether they are so similar that a person looking at one would be deceived into the belief that it was the other; but it is sufficient if one adopts a trade name or a trade mark so like another in form, spelling, or sound that one, with a not very definite or clear recollection as to the real trade mark, is likely to become confused or misled."

"Similarity, not identity, is the test of the infringement of a trade mark. Colorable imitations are as much the subject of legal redress as the more exact and perfect similitudes * * *." 52 Amer.Jur. Sec. 128, p. 600.

This same rule applies "in cases of unfair competition * * * generally that the similarity must be such, but need only be such, as is likely to mislead purchasers of ordinary caution and prudence, or in other words, the ordinary buyer, into the belief that the goods or wares are those, or that the name or business is that, of another producer or tradesman." See 52 Amer. Juris. (Id.).

In Chaplin v. Amador et al., 93 Cal.App. 358, 269 P. 544, the court on plea of Charlie Chaplin restrained defendant from the use of the name "Charles Aplin" as well as from using the same style of dress and mannerisms.

As to similarity of sound see Marion Lambert, Inc., v. O'Connor, 1936, 86 F.2d 980, 24 C.C.P.A., Patents, 781; Coca-Cola v. Snow Crest Beverages Inc., supra.

A court of equity should enjoin any form of passing off, deception, fraud or misappropriation of trade name through devices calculated to deceive or mislead the public to the plaintiff's detriment. See Krause Bottling Co. v. Pepsi-Cola Co., 4 Cir., 1948, 168 F.2d 224.

As to the question of damages, the proof is very unsatisfactory. The defendants are obviously not entitled to damages as asserted in their counterclaim. They contend they lost money in their appearances in this district. If plaintiff is to press its claim for damages, additional testimony must be offered. An accounting may be denied where an injunction will satisfy the equities of the case and the ends of justice. Champion Spark Plug Co. v. Sanders et al.,

[2] Patten v. Superior Talking Pictures, Inc., D.C.S.D.N.Y.1934, 8 F.Supp. 196, protecting the name of "Frank Merriwell" and "Merriwell" under copyright and unfair competition. As to copyright see Universal Pictures Co., Inc., v. Harold Lloyd Corp., 9 Cir., 1947, 162 F.2d 354. As to trade marks see Feldman v. Amos and Andy, 1934, 68 F.2d 746, 21 C.C.P.A. Patents, 823; House of Westmore, Inc., v. Denney, 3 Cir., 1945, 151 F.2d 261.

supra, 331 U.S. 125, at page 131, 67 S.Ct. 1136, 91 L.Ed. 1386.

A decree in accordance with this opinion will be handed down this date.