MUMFORD MOLDING MACHINE COMPANY

*v.*

E. H. MUMFORD COMPANY.

[Submitted May 15th, 1917. Decided August 7th, 1917.]

1. A name applied to a machine covered by letters patent is generically descriptive, even though some of the features of the machine were not the subject of a patent.

2. The fact that the machines sold were numerous and of various kinds does not prevent the use of the patentee's name from being descriptive.

3. Where a patentee licensed complainant to manufacture machines and authorized the use of his name as part of complainant's corporate title, and revoked the license after complainant had established a goodwill in the trade, such good-will cannot be infringed to the detriment of complainant.

4. Where complainant is entitled to the good-will of the trade the question who manufactured the machines is immaterial to their right of protection.

5. A purchase of part of the goods of a bankrupt company which had been licensed to manufacture the machines, does not carry with it the good-will of the bankrupt.

6. Both complainant and defendant will be restrained from using the name "Mumford" in such manner as to lead the purchasing public into the belief that the business of one is that of the other.

On final hearing, bill, counter-claim and proofs.

*Messrs. Lindabury, Depue & Faulks (J. Edward Ashmead),* and *A. C. Harford* (of the Illinois bar), for the complainant.

*Messrs. Hutchinson & Hutchinson* (*C. Percy Hutchinson*), and *Mr. Harvey L. Lechner* and *Mr. Archworth Martin* (of the Pennsylvania bar), for the defendant.

BACKES, V. C.

This controversy is over the right to the use of the name "Mumford" in connection with the manufacture and sale of molding machines.

The contestants are corporations formed under the laws of this state and each seeks an injunction restraining the other from the use, either "directly or indirectly, in connection with the manufacture, sale, advertising of or dealing in any molding machines not manufactured by your orator, of the words 'Mumford' or any colorable imitation of your orator's trade-names 'Mumford,' 'Mumford machines,' 'Mumford molding machines,'· 'Mumford jolt rammers,' 'Mumford core bench jolt rammers,' 'Mumford split pattern drawing machines,' 'Mumford pneumatic vibrators,' etc., or combinations thereof and from copying and colorably imitating the catalogs, circulars and other forms of advertising used ·by your orator and from adopting or using any other method or device likely to injure unfairly your orator's molding machine business or by means of which it, the said defendant (the said complainant) is likely to unfairly profit by the trade reputation of your orator or its product."

The history of the case is this: In 1905 Edgar H. Mumford organized "The E. H. Mumford Company" under the laws of Pennsylvania, for the purpose of manufacturing molding machinery embodying his inventions, upon which he secured patents. After operating four years the company bankrupted. Mumford then arranged with one Sargent, who apparently furnished the capital, to organize the complainant The Mumford Molding Machine Company, and entered into an agreement with that company to grant it an exclusive license to manufacture and sell molding machines under all the patents owned or controlled by him for the full life of the patents, and under all other patents thereafter· to be owned or controlled by him. On its part the company agreed to employ Mumford as its vice-president and general manager, such employment to continue as

long as he was capable of performing the duties of that position, and for his services as vice-president and general manager it agreed to pay him a minimum salary of $400 a month and as commission a sum equal to the excess of three and one-half per cent. of the total gross sales of molding machines over the total annual salary. These payments were to cover all compensation for the license, so long as Mumford remained in the employ of the company as its vice-president and general manager, and in case he ceased to hold those positions he was to receive in lieu of and by way of royalty for the license a total sum equal to twenty per cent. of the net profits of the company, to be paid to him, his personal representatives or assigns. Mumford caused to be executed a license for five letters patent and for six inventions for which applications for letters patent were pending, and remained with the company five years, during which time nine letters patent were granted to him, and two applications were pending upon which letters patent were granted shortly after he severed his relations. The inventions thus patented were incorporated in molding machines manufactured for the complainant during Mumford's employment, at least during some time of it. In November, 1914, he was removed from the office of vice-president and general manager, the company, in the notice of removal, declaring that it would thereafter operate under the alternative provision of the contract providing for the payment of twenty per cent. of the net profits in lieu of the monthly salary. Mumford protested, and notified the company that if it persisted he would be forced to treat his removal as a revocation of the license as well as an abrogation of the entire contract, and that he would demand full reparation, and a few days after, it is assumed, he canceled the contract, which the company accepted and ratified by letter, which also notified him that it renounced and waived any and all rights and advantages it may have had under the contract. Mumford's letter of cancellation is not in evidence, and the assumption is based upon the company's letter of acceptance and ratification of the cancellation of the contract. Mumford died shortly after, in April, 1915, in the meantime having carried on trade in the name of The E. H. Mumford Company, the Pennsylvania corporation.

The following month, his son, T. J. Mumford, and his widow, Rose Skeel Mumford, formed the defendant company under the name of E. H. Mumford Company, to which the widow, who was the sole legatee under the will of Edgar H. Mumford, granted an exclusive license to manufacture and sell molding machines, containing the patented improvements under which the complainant formerly operated, represented by sixteen letters patent issued to Edgar H. Mumford. Inevitable confusion in the trade resulted, for which, in a measure at least, both parties were responsible, in that neither recognized and respected the rights of the other, for it must be acknowledged that both have vested rights in the field of commerce, which the law will protect against infringement.

The principal question presented, and upon the decision of which ultimately rests the course to be outlined to these litigants in their future dealings, is whether the name "Mumford" as applied to molding machines is a generic designation indicating machines embodying the inventions of Mumford, or whether it signifies origin or source of manufacture only, i. e., a trade name. Now, for this purpose, we must go a little further into the history of Mumford's connection with the development of molding machinery. Molding machines are used only in foundries and utilized in making sand-moulds for metal castings, and as implements for that purpose are perhaps as old as machinery science, and as multifarious in style, type and cast, as the variety of uses to which they are put in the numerous lines of foundry work. Mumford, who was an inventor and an authority on molding machinery, and widely known as such throughout the foundry trade, from time to time invented substantial and valuable improvements upon the basic principles of different kinds of molding machines, for which inventions the government gave him letters patent. To his improved machinery he gave his surname, and in the foundry trade, to which the molding machinery business is, in reality, an adjunct, and which is managed and controlled chiefly by experts keen to note the progress in machinery—the purchasing public in the case—Mumford's line of molding machines came to be known because of his inventions, and to the trade the name "Mumford" stood

for the line of machines embodying those inventions. That this understanding prevailed generally is established by numerous witnesses of capacity called in the case. Furthermore, no one but Mumford had the right to manufacture his patented machinery without his consent, ·and having associated his name with the monopoly, it became the generic description of his types of molding machinery. "One class of names," says *Rogers on Good Will, Trade-marks and Unfair Trading,* ·ch. *24, p. 236,* "the courts have held to be descriptive by a course of reasoning which is not perhaps convincing to persons unused to legal methods of thought. These are the names which have been applied to patented articles. After a good deal of discussion and many diverse decisions the courts have at last, with substantial unanimity, laid down the rule that the name applied · to a thing covered by letters patent is descriptive. The theory is that the article cannot be the subject of patent unless it is absolutely new. Being new it must have a name. The name, therefore, describes a new thing and becomes the descriptive or generic name of that ·thing. During the term of the patent the right to use the name which has been applied to the thing belongs · exclusively to the owner of the patent, who may license the use of the name in connection with the patent, and restrain its use on other than the patented article, because this would be a deceptive misdescription. No particular difficulty is experienced during the life of the patent because its owner, having the exclusive right to make, use and vend the patented thing, and being able to stop the use of the name on articles not made in accordance with the patent, enjoys a complete monopoly of the article and name."

The text is supported by many cases in this country and England. *Singer* v. *Stanage,* 6 *Fed. Rep. 279; Gally* v. *Colts' Patent Fire-Arms Co.,* 30 *Fed. Rep. 118; Armstrong* v. *Ettlesohn, 36 Fed. Rep. 209; Centaur* v. *Heinsfurter, 84 Fed. Rep. 955; Adam* v. *Folger, 120 Fed. Rep. 260; DeLong Hook and Eye Co.* v. *American Pin Co., 200 Fed. Rep. 66; Dover* v. *Fellows, 163 Mass. 191; Waterman* v. *Shipman, 130 N. Y. 301; Singer Manufacturing Co.* v. *June Manufacturing Co., 163 U. S. 169; Cheavin* v. *Walker, 5 Ch. Div. 850; Powell* v. *Birmingham*

*Vinegar Brewery Co. (1896), 2 Ch. 54; Linoleum Manufacturing Co.* v. *Nairn, 7 Ch. Div. 834.*

In *DeLong Hook and Eye Co.* v. *American Pin Co.,* the court observed: "No matter in what other connection the owner may have used the name, it must be remembered that one of the advantages of his patent monopoly has been to have his article known to the public by a name which in the public mind can only mean one thing as applied to that patented article, to wit, that it is the article. When, during the life of the patent, the public bought a Singer sewing machine, it bought a machine of a particular character, and associated solely in the public mind with the machines made under the Singer patents."

In *Powell* v. *Birmingham Vinegar Brewery Co.,* Lindley, L. J., made this comment: "Again, if a person makes or sells an article and calls it by a particular name, the use of that particular name by others for the same sort of goods is not necessarily an infringement of his rights, even if the name is not obviously descriptive. If the article is a patented article, sold by the patentee under the name in question, then when the patent expires anyone is at liberty to make and sell the article, and to sell it under the name by which it has become known in the market; and if nothing more is done, the patentee has no redress." This was decided in *Cheavin* v. *Walker* and *Linoleum Manufacturing Co.* v. *Nairn.*

Consonant with the property rights that spring from tacking a name to a patented article, the complainant, throughout the five years of Mumford's employment, recognized and treated the name Mumford as the generic description of the line of molding machines covered by his patents. Because of his scientific skill and his inventive genius, Mumford's name had commercial charm; the company was organized, primarily, to develop his inventions, surely not to secure his business talents, for, after his failure, he had little to recommend him in that respect; handsome royalties were paid for his license; his name was featured in the corporate title, in advertising, and on the patented devices; and, above all, the machines were held out to the trade as the subject of his letters patent.

The contention is made that the principle of the text in *Rog. Good Will* is not applicable, because Mumford molding machines were not patented as an entirety. That the machines were not patented as a whole is beside the question. This was unfeasible, because of their antiquity. As already stated, Mumford added to the basic principles his numerous and varied inventions, which, when embodied in the particular machine or class of machines, distinguished the machine or class as a whole from those of any other inventor or manufacturer; and although the article was one in common use, the improvements invented and exclusively incorporated had the effect of differentiating the patented from the common article, and so when the name Mumford was applied it carried with it to the trade the signification that the machine was of definite character and mechanism, and of the line of machinery patented by him, and indicated nothing in regard to the workmanship or by whom manufactured. Call the patented inventions incidental, accessory or detail or whatnot, as the complainant now sees fit to characterize them and to minimize their importance, they nevertheless were, in the particular type of machine in which they were embodied, sufficiently characteristic and fundamental to warrant the issuing of letters patent, and sufficiently formidable to ward off infringement for many years, and to operate as an effective shield against intrusion upon the monopoly enjoyed by the complainant during the period of its license.

It is also claimed that the rule is not to be applied because certain of the machinery included, *inter alia,* a feature patented to Mumford and Huggins, or a feature patented to Mumford and Atha, or a feature patented to one Huggins. The answer is that the inclusion of a subsidiary patented device of another, could not, conceivably, alter the public impression, as to the predominating feature of the structure.

The further contention that "Mumford" could not be the generic description of the patented articles, because there were many different machines in the Mumford line, so that it was impossible for the name to designate or describe all of them, is answered in *Singer* v. *June,* by Mr. Justice White, upon a state of facts somewhat similar to the present. "It cannot,"

he says, "be denied that the Singer machines were covered by patents, some of which were fundamental, some merely accessory. There can also be no doubt that the necessary result of the existence of these patents was to give to the Singer machines, as a whole, a distinctive character and form which caused them to be known as Singer machines, as deviating and separable from the form and character of machines made by other manufacturers. This conclusion is not shaken by the contention that as many different machines were made by the Singer Manufacturing Company, therefore it was impossible for the name 'Singer' to describe them all, because the same designation could not possibly have indicated many different and distinct things. The fallacy in the argument lies in failing to distinguish between genus and species. To say that various types of sewing machines were made by the Singer Manufacturing Company in no way meets the view, borne out by the testimony, that all machines by them constructed were in some particular so made as to cause them all to be embraced under the generic head of 'Singer,' and to be protected in some respects by the patents held by the company. From this fact it resulted that during the life of the patents none of the machines as a whole were open to public competition. Persuasive support of this view is afforded by the fact that in many adjudicated cases, to which we shall have occasion hereafter to advert, where, since the expiration of the patents the right to the exclusive use of the name 'Singer' has been asserted, it has, almost without exception, been found that Singer machines, as a whole, were a distinctive class, preserving a general uniformity of nature, however varying may have been the types by which their structure was manifested.

"It may be assumed that the proof establishes that for certain classes of the general type of Singer machines, that is, the species used only for particular and exceptional manufacturing purposes, an addition of some other word or description to the generic name 'Singer' was necessary to completely convey a perfect indication of the machine referred to, that is, Singer's 'carpet-machine,' Singer's 'leather-machine,' &c. But this fact does not counterbalance the conclusive proof that, as a whole,

the Singer machines represented a general class, and were known to the public under that comprehensive name and no other."

The conclusion, foreshadowed· by the finding of facts and the authorities cited, that the name "Mumford" is the generic description of machinery constructed under his patents and during the existence of the monopoly, flowing from the letters patent, the subject of exclusive appropriation by the patentee and his assigns, upholds the defendant's title.

But, because of the former contractual relations between the patentee and the complainant, we must go further and consider the property rights which accrued to the complainant from the secondary sense in which the name came to be known to the public, as origin or source of manufacture, for, as the supreme court, in *Singer* v. *June,* said: "To say that a person who has manufactured machines under a patented monopoly ·can acquire no good-will, by the excellence of his work, or the development of his business, during the patent, would be to· seriously ignore rights of private property, and would be against public policy, since it would deprive the one enjoying the patent of all incentive to make a machine of a good quality, because at its termination all the reputation or good-will resulting from meritorious work would be subject to appropriation by everyone. On the other hand, to compel the one who uses the name after the expiration of the patent, to indicate that the articles are made by himself, in no way impairs the right of use, but simply regulates and prevents wrong to individuals and injury to the public." *Ludlow Valve Manufacturing Co.* v. *Pittsburgh Manufacturing Co., 166 Fed. Rep. 26.*

Mumford was instrumental in organizing the complainant company, and gave it his name, which he at all times insisted should be conspicuously displayed on its product and in its advertising matter. By the expenditure of large sums of money in advertising the monopoly, superiority of workmanship and fair dealing with customers, the company built up a large and valuable business, in which the skill and industry of Mumford played no small part. The manufacture of machines was not confined to those patented by Mumford. Others were built that contained no patented devices, and this was the. contemplation of

the parties, if I interpret the contract rightly. The record discloses that of a total of twenty-three species and one hundred and five sizes of machines, twenty species and ninety-nine sizes were patented, and that a large percentage in number of machines marketed did not embrace any features covered by the Mumford patents. Obviously, it must have been understood by Mumford that the good-will and trade name, which he was actively promoting, would survive to the company upon the termination of the agreement, by the expiration of its terms, for cause or by mutual consent; and, correspondingly by the company, upon the abrogation of the contract before its natural expiration, that the property rights flowing from the patents reverted to the patentee. So, as a consequence, when the patentee and the manufacturer parted company, a reciprocal duty arose to refrain from carrying on their respective businesses in a manner calculated to deceive the purchasing public to the injury of the other, and in this respect, as already intimated, both parties were remiss, but in different degrees. Although after the severance, the complainant ceased to manufacture molding machines embodying the patents, it continued to play up the catch-name "Mumford" in its advertising matter and on its wares, and in some instances to display machines as patented, without indicating in anywise the cancellation of its license, thus giving forth the impression that its title to the patents was unimpaired and its product unchanged. The defendant company was much bolder. Besides adopting the name "Mumford" as part of its corporate title, it virtually copied the complainant's catalogue bodily, cut for cut of machines, figure numbers, sizes, capacity, gross weights and code words, including cuts of machines manufactured by the complainant, upon which there were no patents whatever. The descriptive matter was reproduced *verbatim*, and the copy even went to the point of representing that the complainant's London correspondent was that of the defendant. And so with its other advertisement, replete with simulations and cunning misrepresentations, and done with such aggravation as to be absolutely convincing of a studied effort to lead the trade into the belief that the defendant was the complainant's successor, and that it was the sole manufacturer of Mumford's molding machines;

altogether a most flagrant case of pirating the business of the complainant. And what is more, the defendant openly avows it was its deliberate intent and purpose to simulate the catalogue, and attempts to justify its conduct on the ground that the molding machinery therein advertised was of structures embodying the Mumford patents, and, as the complainant company had surrendered its license to manufacture, *ipso facto,* it had lost its right to advertise them. The complainant company had on hand and for sale machines which it rightfully made and had the right to sell; and, furthermore, this specious claim does not meet the charge that the defendant's catalogue included cuts and descriptive matter of complainant's unpatented machinery, and that its other advertising was obviously designed to mislead. *Eureka Fire Hose Co.* v. *Eureka Rubber Manufacturing Co., 69 N. J. Eq. 159; National Biscuit* v. *Pacific Coast Biscuit Co., 83 N. J. Eq. 369.*

It is urged that the complainant, by reason of its unconscionable conduct in arbitrarily and without cause terminating the contract, forfeited all rights thereunder and that it ought not to be heard in equity to maintain rights it fraudulently retains. It may be, as the defendant argues, that "the inference is plain here that the complainant company, after having gotten Mumford in its toils and having obtained all the benefit it possibly could have derived from him and his inventions, threw him out into the cold, hoping thereby to still retain those benefits and advantages without compensation." The difficulty with this is that the question is not fully presented for decision. The issue is raised by the answer, but all that appears on the face of the record is, as already noted, Mumford's release as vice-president and general manager, and his subsequent cancellation of the contract and the company's ratification thereof. This implies a mutual rescission so that the causes which led to it are immaterial, so far as this case is concerned. The employment feature of the contract was to last during the lifetime of the patents, so long as Mumford was capable. Off the record the complainant says it had ample cause for his discharge. Whether the discharge was lawful was not tested by Mumford, who seemed to have treated the incident as closed, and judgment ought not to be passed,

which would have for its basis only doubtful and conflicting inferences.

·It is further set up in the briefs that there is no justification for the continuance of the complainant company, even as a name, because it has no books, bank account, employes, assets worth mentioning, and neither manufactures nor sells. The company never manufactured. Until 1913 its principal office was in Plainfield, where its machines were built by another concern, and that year it moved to Chicago, where machines are manufactured by the Hanna Engineering Works, the owner of all of its capital stock, and its product is marketed by the Vulcan Engineering Sales Company. The claim is that the complainant clings to the name "Mumford," simply to enable the manufacturing company and the sales company to derive profits at the expense of the defendant in the deception of the public. The premise is hardly true, but a complete answer is that we are not concerned with the methods of the complainant in carrying on its business or how it disposes of its profits. Its good-will, being established, entitles it to protection against infringement. The amount of its capital stock is unimportant, as is that of the defendant's, as well as the fact that the defendant does not manufacture its output.

It is also set up by the complainant that its trade name was inherited from the E. H. Mumford Company of Pennsylvania by the purchase of the assets of that company, which, it is claimed, carried with it the good-will. Undoubtedly, the property rights of a trade mark or trade name may pass by an assignment or by operation of law to anyone who takes at the same time from the assignor the right to manufacture or sell the particular merchandise; and, unquestionably, the transfer of the property and effects of a business may carry with it the exclusive right to use such trade marks or trade names as had been used in such business. *Dixon Crucible Co.* v. *Guggenheim,* 2 *Brew.* *(Pa.)* 321; *Allegretti* v. *Allegretti Chocolate-Cream Co.,* 52 *N. E. Rep. (Ill.)* 487. But the doctrines lack application to the present situation. Here the complainant did not succeed to the business of the bankrupt company. It purchased only a part of its wares and acquired the right to manufacture the class of

goods manufactured by the old company, not from that company, but from Mumford, the owner of the patents. It was manifestly not desirable to succeed to the business and good-will, if it had any, of the defunct company, with its large outstanding liabilities to creditors and stockholders, and a new company was born, with a new name, and with the right to apply that name to products derived exclusively by contract independently of the old company.

The transaction between the licensee and patentee, resulting in the peculiar situation of leaving the parties with perfectly meritorious, though conflicting, claims to the trade name "Mumford," involves the more difficult task of working out a line, within the boundary of which each may enjoy the widest latitude in competing with the other, but which may not be crossed without encroaching. This may be accomplished with the least inconvenience or danger by each plainly distinguishing its goods from the others. Were it not for the defendant's property right in the name, the principle declared by the court of errors and appeals in *International Silver Co.* v. *Rogers Corporation, 67 N. J. Eq. 646,* would be controlling, and the defendant would be enjoined unqualifiedly. There the use of an individual's name, in a corporation of which he was an incorporator and officer, was enjoined, because it was satisfactorily shown that it was voluntarily selected and for the purpose of making an unfair use of it in competition with the complainant. *Eureka Fire Hose Co.* v. *Eureka Manufacturing Co., supra; L. Martin Co.* v. *L. Martin & Wilckes Co., 75 N. J. Eq. 39, 257.* But the application of that rule would be too drastic and the remedy punitive, in that it would, in effect, destroy private property, for it cannot be denied that the patentee's name, associated with his inventions, adds materially to the market value of the patents. It will answer all practical purposes to enjoin the defendant from using the name "Mumford" in its corporate title, or otherwise, except in the vending of molding machines manufactured under the exclusive letters patent issued to Edgar H. Mumford, and joint patents to Mumford and Atha and Mumford and Huggins, and not then, unless it shall, in its catalogue, circulars and advertisements distinctly indicate, in type as large and conspicuous as "Mumford" in its corporate title, or any con-

traction or address thereof, that the machines are not of complainant's manufacture, and unless it shall, upon the machines themselves, conspicuously and unmistakably specify that such machines are not of complainant's make.   The defendant will also be enjoined from copying or colorably imitating the catalogue, circulars or other forms of advertising used by the complainant, not including so much of said catalogue as represents machines embodying the patents of Edgar H. Mumford, exclusive of the code words; and will further be enjoined from representing in its advertisements, expressly, by implication, insinuation, or otherwise, that it is the sole manufacturer of Mumford molding machines.

On the other hand, the complainant will be enjoined from using the name "Mumford" in its corporate title, or otherwise in vending molding machines of the type formerly manufactured and sold by it under the license of Edgar H. Mumford, and now or hereafter manufactured under the patents of Edgar H. Mumford, and sold by the defendant, unless it shall, in its circulars, catalogue and advertisements distinctly indicate, in type as large and conspicuous as "Mumford" in its corporate title, or any contraction or address thereof, that the machines were not made under the Edgar H. Mumford patents, and unless it shall, upon such machines, conspicuously and unmistakably specify that such machines were not made under the Edgar H. Mumford patents; or unless, in vending such machines and other machines containing the Mumford-Huggins valve patent allusion is made to such patent, it shall, in its advertisements and on the machines in the manner aforesaid, state that they are not of defendant's manufacture.

These restrictions are subject to modifications upon motion to settle the final decree, and are meant to indicate the attitude of forbearance the parties must assume towards each other in the future.

The complainant's request to enjoin the defendant from using "Mumford" in its corporate title is denied, for the reason stated by Vice-Chancellor Emery and set forth in the third subdivision of his opinion in *Eureka Fire Hose Co.* v. *Eureka Manufacturing Co., supra* (at *p. 174*), with the same reservation.

There will be no accounting and no costs.