39 N.J. Super. 70 (1956)
120 A.2d 477
SACHS FURNITURE & RADIO CO., PLAINTIFF-RESPONDENT,
v.
SACHS QUALITY STORES CORP., DEFENDANT, SACHS QUALITY STORES, INC., DEFENDANT-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Argued January 16, 1956.
Decided February 10, 1956.
*73 Before Judges CLAPP, JAYNE and FRANCIS.
Mr. Archibald Kreiger argued the cause for the respondent (Messrs. Bornstein, Kohlreiter & Rubinson, attorneys).
Mr. Mahlon Pitney argued the cause for the appellant (Messrs. Pitney, Hardin & Ward, attorneys; Mr. Roger C. Ward and Mr. William D. Hardin, counsel on the brief).
The opinion of the court was delivered by FRANCIS, J.A.D.
In this action an injunction was granted which provided that so long as the plaintiff continues to operate a furniture store at or in the area of 75 Market Street, Newark, New Jersey, the defendant shall not sell furniture in that area under the name "Sachs." The legal and equitable propriety of the restraint has been submitted to us for examination.
The plaintiff Sachs Furniture & Radio Co., a New Jersey corporation, had been conducting a store for the retail sale of furniture at 75 Market Street, Newark, New Jersey, for *74 a number of years. In October 1954 defendant Sachs Quality Stores, Inc., a New York corporation, opened a store at 51 Market Street for the sale of furniture, household appliances, wearing apparel and other items. Defendant's establishment is 300 to 350 feet west of that of plaintiff, on the same or north side of the street. A very narrow intersecting street intervenes. This side of Market Street is known as "furniture row" because of the concentration of such stores, there being 12 of them between defendant's place of business and the west side of Washington Street, which is the next block east of plaintiff.
Proper development of the problem to be considered requires a statement of the history of these two corporations, which, as is noted immediately, carry the name "Sachs" as the first word in their business names.

HISTORY OF DEFENDANT, SACHS QUALITY STORES, INC.
In 1896 Israel Sachs established a retail store on Second Avenue in New York City, under the name "F. Sachs" for the sale of furniture, floor coverings and bedding. It continued as a proprietorship until 1927 when incorporation occurred as "Sachs Quality Furniture, Inc." The present name "Sachs Quality Stores, Inc." was taken in 1947, because in the intervening years the operation was expanded to include curtains, slipcovers, bedspreads, radios, televisions, wearing apparel and jewelry.
The business has always been a family dominated and controlled one. When Israel Sachs died in 1949, his descendants acquired ownership. From that time on, sons and sons-in-law took over the management, one son becoming president and one chairman of the board of directors. All of the voting stock and most of the equity remain in the family.
The passing years brought considerable growth and at present, excluding the Newark establishment, defendant maintains five stores: two in Manhattan, two in the Bronx and one in Jamaica. The total gross business for the year ending June 30, 1954 was approximately $8,000,000. Apparently the high point was $9,600,000 in 1952 or 1953.
*75 Newspaper advertising was instituted in 1917 and has been engaged in extensively since that time. The New York Times, Journal-American, Daily and Sunday News and Daily and Sunday Mirror were used. All of these have wide circulation in Newark and throughout the State of New Jersey. Newark papers were employed also, after the store in that city was given the Sachs name.
Since 1921 radio broadcasting and later television became additional advertising media. Although New York stations were the emanation points, the messages were designed for reception and were received over wide areas in New Jersey. The names Sachs and Sachs Quality were widely publicized; a musical jingle of defendant's New York telephone number, Melrose 5-5300, became well known and the stores were spoken of constantly in these media as "Home of the Three Little Sachs." The expenditure for advertising for the fiscal year 1954 was almost $790,000; millions of dollars had been spent in that way over the years.
The names Sachs and Sachs Quality have always featured its advertising. In 1931 the word "Sachs" was registered as a federal trademark. The form was a signature cut with a wide line from the terminal S sweeping under the word and back to the capital S, with "Quality Furniture, Inc." printed in smaller letters on the underline. A new trademark was applied for December 1, 1945 and its registration was granted October 7, 1947. It pictured the word "Quality" with a large Q and the name "Sachs" encircled by the Q. Reregistration of the same mark occurred in 1953, the only change being a heavier and blacker shading of the Q.
Although no store was maintained in New Jersey prior to October 1954, defendant's mail order business and sales to residents of this State ran from $400,000 to $500,000 annually.

HISTORY OF PLAINTIFF, SACHS FURNITURE & RADIO CO.
Louis Sachs (no relative of the family owning the defendant), then and now a resident of Paterson, New Jersey, *76 opened a retail furniture store in that city in 1929. He incorporated in 1931 under the name "Sachs Furniture & Radio Co." After six years, the company moved to Passaic, where it remained until 1939. Throughout the years advertising was carried on in the Paterson and Passaic papers.
In 1935 defendant ascertained that plaintiff had simulated its trademarked signature cut practically to the point of identity, the only difference (in one cut used) being that the sweeping underline said "Furniture & Radio Co." followed by three marks indicating sparks, instead of defendant's "Quality Furniture, Inc." Suit was threatened and a written compact was executed by plaintiff to desist from the practice.
This agreement recited that Sachs Quality Furniture, Inc. was engaged in the sale of house furnishings, furniture and similar merchandise throughout the states of New York, Connecticut and New Jersey, and that the plaintiff was conducting a similar business in Paterson and Passaic. Plaintiff stipulated that the "trade name, trade mark * * *" described "and as used by" this defendant "in its business belongs to and is [its] sole property," and that "so long as it [the plaintiff here] exists in the business under the name it has assumed * * * it [plaintiff] will not at any time * * * use its trade name so as to possibly lead the public to believe that it is identified with `Sachs Quality Furniture, Inc.'" and that it would not simulate or infringe upon the Sachs Quality trade mark. And plaintiff covenanted that it would not represent to any of its customers that it was connected with that company. In return, Sachs Quality agreed that plaintiff here could use its own new and distinguishable trade mark incorporating "Sachs" anywhere in New Jersey free of a claim of infringement.
In 1939 plaintiff came to Newark and established its place of business at 75 Market Street in furniture row. Adjoining it on both sides are large furniture houses. In 1950 or 1951 it opened another place on Route 4, Paramus, New Jersey, and at the time of the trial was building a third on Route 46, Paterson.
*77 Plaintiff limited its advertising to newspapers and direct mail to customers every month or two, except between 1939 and 1942 when radio broadcasting was engaged in.
According to defendant's president, in 1940 and 1941 during the time plaintiff was advertising by means of radio, some confusion arose among members of the public as to which store was publicizing its wares over WNEW. As a result, in both those years defendant sent notices to its New Jersey customers to the effect that all of its stores were in New York and that it was not connected with any establishment in this State. And on May 23, 1941 defendant wrote to plaintiff complaining about the confusion caused by its radio program, and particularly about an upholstery item which apparently plaintiff was calling attention to over the air. Defendant charged that it had begun advertising the item by radio more than a year earlier through WMCA. The letter referred also to the earlier controversy over the simulation of the signature cut and to the agreement "to do nothing in your advertising which would tend to create the confusion which has evidently been created as the result of both of our radio programs advertising the identical item." Plaintiff's president, when testifying, recalled the 1940 and 1941 notices but said that his company's successful broadcasting campaign influenced defendant to disseminate them. In any event, plaintiff company ceased using the radio as a medium in 1942, "when the war came on."
Plaintiff's store has continued in Newark since 1939 and during that period the name "Sachs" has been emphasized on its facade. As already shown, a new place was established in Paramus four or five years ago, and another was about to be opened on Route 46, Paterson, at the time of the hearing in the trial court.

CIRCUMSTANCES ATTENDING ACQUISITION BY DEFENDANT OF THE NEWARK STORE
Following a series of transactions which began on May 28, 1954, defendant acquired the assets of Michaels Brothers, Inc., a retail furniture chain with ten stores operating under *78 the name "Michaels Brothers." One was located at 51 Market Street, Newark, the site of defendant's store here involved.
The testimony shows that when this transaction was consummated, the plan was to close down some of the Michaels' stores, including the one in Newark. The reason ascribed was that there had been a decline in the furniture business along the eastern seaboard and a general trend had come about in the industry to move out of the congested cities to outlying open road districts. (Perhaps no better indication of this movement can be had than the plaintiff's experience with the Paramus store where the sales volume produced a doubling of its space in the course of a year.) At the time of the trial four had been continued in New York with the Michaels Brothers name, one as "Furniture Dealers Outlet." Another in Jamaica had been closed but was about to be reopened with the Sachs Quality name. The Newark establishment was carried on with the trade name changed to Sachs Quality. It appeared also that serious consideration was being given to the elimination of one of the four New York places, namely, that in Brooklyn.
Sharp criticism is leveled by the plaintiff at the supplanting of the Michaels name in Newark with "Sachs," in contrast with the retention of that label in New York. The explanation advanced at the trial was that three of the four New York places are within two blocks of existing Sachs stores, and the Brooklyn operation may be discontinued entirely.
From May until about October 10, 1954 the Michaels Brothers name was retained for the Newark store. Defendant's testimony asserts a number of reasons for the change.
From 1951 to 1954 defendant conducted a furniture department in Klein's store in Newark; the Klein name was used. The volume of sales was about $700,000 annually. In 1954 Klein's needed the space and the concession had to be abandoned. Moreover, as mentioned above, Sachs Quality Stores in New York had been the recipient of about a half million dollars worth of business through mail orders from *79 and direct sales to New Jersey residents. Defendant's representatives felt that a Sachs store in Newark would be a service advantage to these New Jersey people.
A related consideration was the opinion that the extensive Sachs newspaper, radio and television advertising would bring even more business to a New Jersey store. And an additional inducement was a 40% reduction in the rent on the Michaels lease which had about 17 more years to run.
When the decision was made to abandon the Michaels Brothers inscription, a trade journal carried an announcement that Sachs Quality Stores, Inc., intended to open a place of business on Market Street, Newark, New Jersey. In June or July 1954 plaintiff's president, Louis Sachs, discussed the matter with defendant's vice-president and general manager. Unquestionably there was talk between them about the possibility of confusion resulting from the presence of two furniture houses a short distance apart on the same street, both featuring the name "Sachs." But there is dispute as to the full text of the conversation. According to defendant's vice-president, Louis Sachs said that his business in Newark was declining, that he was very happy with the operation in Paramus, and that he would be glad to leave Newark if defendant would buy his inventory and accounts. On the other hand, Louis Sachs said his statement was that if his business was going to be taken away, he would sell his inventory and accounts to defendant at cost. In any event, no agreement to sell was reached.
The proof discloses that plaintiff's lease had expired prior to the trial date and that he was then holding over on the basis of a six months' extension given by the lessor. Louis Sachs conceded that his future action with respect to renewal of the lease depended at least in some measure upon the outcome of this litigation. But he denied contemplating a departure from Newark before the advent of the Sachs Quality store; in fact he said his company had been considering taking over two more floors at its present address.
Defendant spent $20,000 refurbishing the premises at 51 Market Street. Then a large sign bearing the name "Sachs" *80 written vertically and at the bottom a smaller "Sachs" encircled by the trade mark Q, was suspended away from the building. A large copy of the trade mark was painted on the east wall. Another sizeable sign bearing the same mark was placed over the entrance way; and the mark was stamped on each of the three front awnings and painted on four of the front windows. The record reveals testimony to the effect that some of defendant's officers, when considering the change of name from Michaels Brothers to Sachs Quality, were concerned as to whether plaintiff would reap some of the business which their company's large scale advertising would produce. Presumably that anxiety was responsible for the emphasis on the Sachs Quality trade mark on the front of the store. It appears also that between the opening date, October 10, 1954, and August 1955, in addition to its general overall company publicity, $25,500 was spent on advertising the Newark store, $11,000 of which was spent in the first two months.
The proof shows plainly that the advent of the Sachs Quality store in proximity to the plaintiff was accompanied by some confusion on the part of the public. Plaintiff was burdened with a large number of telephone calls daily which were intended for defendant. An important inducing factor in this connection was the absence of a listing for defendant in the telephone book. The only Sachs furniture company contained therein was the plaintiff. The phone at 51 Market Street was in the Michaels name and remained so until the next directory was released. With the passage of time and the appearance of the defendant's listing, the calls received by plaintiff subsided substantially. Louis Sachs testified that between October and Christmas time 1954 they numbered "perhaps twenty-five or more" daily; in the first three or four months of 1955 about half as many came to his phone. One of his employees kept a record of calls received from defendant's customers between February 16 and September 30, 1955, about deliveries of goods that had been made to them. They totaled 124 over this seven and one-half months period, or slightly less than four a week. At the time of *81 trial, however, plaintiff was still experiencing mistaken telephone messages.
In addition, mail intended for defendant was delivered to plaintiff; trucks attempted to leave goods shipped to defendant; customers seeking defendant came to its store and sometimes were obnoxious because they came to complain about purchases made at the Sachs Quality store. An effort was made to prove an attempt to pirate a customer of plaintiff who had been sent from the Paramus store to the one in Newark and who got into 51 Market Street by mistake. Examination of the testimony leaves us in serious doubt that the incident carried the implications contended for; in any event, we feel that against the background of the whole case it has little significance.
It is conceded that none of the matters complained of by plaintiff was brought to defendant's attention prior to the institution of the injunction action. The claim is made that defendant's physical intrusion into the Newark market has caused a decline in plaintiff's business. Evidence was offered that the delivered sales for the first nine months of the years 1952 through the same period of 1955 were:

 1952 ....................... $107,239.42
 1953 ....................... $114,209.86
 1954 ....................... $ 98,706.22
 1955 ....................... $ 76,257.33

The explanation given for the rise in 1953 over 1952 was that "some of our promotions were more successful than others." In this connection, of course, the trend to the outlying districts cannot be overlooked. And the decline in the Michaels Brothers and Sachs Quality volume at 51 Market Street over the same period must be noted:

 1952 (Michaels) ................... $692,850.
 1953 (Michaels) ................... $754,388.
 1954 (Michaels) ................... $579,048.
 1955 (Michaels 7/1/54 to 10/15/54
 Sachs Quality to 6/30/55) ... $310,045.

The figures are for the full fiscal years ending June 30; sales for the nine months periods do not appear in the *82 record. It is thus manifest that plaintiff's percentage falling off was not as great as its competitors. The record discloses also that defendant's New York City store on Eighth Avenue showed a drop from a peak of $3,125,000 in 1950 to $1,872,000 in 1955. Presumably this proof was submitted to support the assertion of general retrograde along the eastern seaboard.

THESE PROCEEDINGS
The complaint charges that defendant willfully and maliciously acquired the location at 51 Market Street to take advantage of plaintiff's good will and is attempting to deceive the public into believing that dealings at that address would be with the plaintiff. The trial court found that unfair competition had been proved and enjoined the use of the name "Sachs" on defendant's store.
At the outset of a consideration of the legal problems involved, attention focuses on the fact that Sachs is the legitimate family name of the owners of these two corporations. Everyone has the natural right to use his name to indicate individual or corporate operation of his business. Hilton v. Hilton, 89 N.J. Eq. 182 (E. & A. 1918); Yale & Towne Mfg. Co. v. Rose, 120 Conn. 373, 181 A. 8 (Sup. Ct. Err. 1935); 1 Nims, Unfair Competition and Trade Marks (4th ed. 1947), § 67, at 191; 52 Am. Jur., Trademarks, Tradenames, § 64, at 547 (1944). A presumption exists that such use of one's own name is an honest one. International Silver Co. v. Rogers, 72 N.J. Eq. 933, 937 (E. & A. 1907). And the descendants of the original user who continue the business in the ancestor's name, succeed to his right to protect it against unfair competition by a bearer of the same name. 1 Nims, op. cit., supra, § 80, at 233.
However, one may not use his name so as to compete unfairly or fraudulently or as part of a plan to palm off his wares as those of a namesake. International Silver Co. v. Rogers, supra, 72 N.J. Eq., at 936; Eureka Fire Hose Co. v. Eureka Rubber Mfg. Co., 69 N.J. Eq. 159, 168, 169 (Ch. 1905), affirmed on opinion below, 71 N.J. Eq. 300 *83 (E. & A. 1906); International Silver Co. v. William H. Rogers Corp., 67 N.J. Eq. 646 (E. & A. 1905); 1 Nims, op. cit., supra, § 67, at 192.
A family name used alone or with other words as a trade name, or used with symbols of some kind as a trade mark may, through usage over a period of time and association with a product or products, come to be so interrelated in the public awareness, that to mention the name is to bring the product, and it alone, to mind. Such an identification or secondary meaning entitles the user to protection against unfair and deceptive usage by another in the same business, even though he bears the same name. International Silver Co. v. Rogers, supra; Hilton v. Hilton, supra; cf. L.E. Waterman Co. v. Modern Pen Co., 235 U.S. 88, 35 S.Ct. 91, 59 L.Ed. 142 (1914); American Shops, Inc. v. American Fashion Shops, Inc., 13 N.J. Super. 416 (App. Div. 1951), certification denied 7 N.J. 576 (1951); Coca-Cola Co. v. Koke Co., 254 U.S. 143, 145, 41 S.Ct. 113, 65 L.Ed. 189, 192 (1920); R.H. Macy & Co. v. Colorado Clothing Mfg. Co., 68 F.2d 690 (10 Cir. 1934); 52 Am. Jur., Trademarks, Tradenames, § 133, at 609 (1944); 1 Nims, op. cit., supra, § 72, at 219; Developments in the Law, Trade-Marks and Unfair Competition, 68 Harv. L. Rev. 814, 823 (1955).
Plaintiff here made out no case of any substance for the view that the word "Sachs," through a use of it in the furniture business even in the Newark area, had acquired a secondary meaning. True, it had sold its wares at 75 Market Street in furniture row for 15 years and had engaged in some advertising. But it cannot be said with any conviction that to the consuming public mention of the word "Sachs" brought plaintiff's and only plaintiff's store or goods to mind.
In fact, on the basis of the large-scale employment of the name and trade mark "Sachs Quality" in advertising media in New Jersey, it can be said with some force that the name is more likely associated by the public with the defendant than with the plaintiff. Certainly its trade mark was the subject of concurrent dissemination with that of the plaintiff. *84 As already pointed out, even before defendant was in Newark physically, its advertising produced $400,000 to $500,000 of business annually in New Jersey.
There is little doubt that defendant regarded Newark as a part of its market  a not uncommon notion. The Second Federal Circuit Court of Appeals, for purposes of an unfair competition case, referred to New Jersey as "a part of the New York retail market," and said that "the geographical or state line in no way interferes with this conclusion." Terminal Barber Shops, Inc., v. Zoberg, 28 F.2d 807, 809 (2 Cir. 1928). Our own courts cannot ignore the fact that thousands of citizens of this State commute daily to their myriad commercial activities in New York and regularly read newspapers originating there. But we need not consider whether the "Sachs Quality" mark had acquired such a secondary meaning as would have justified a claim of unfair competition by defendant when plaintiff moved to Newark and emphasized the word "Sachs" in its store front sign. 51 West 51st Corp. v. Roland, 139 N.J. Eq. 156 (Ch. 1946); Stork Restaurant, Inc., v. Sahati, 166 F.2d 348 (9 Cir. 1948); Brooks Bros. v. Brooks Clothing, Ltd., 60 F. Supp. 442 (D.C.S.D. Cal. 1945), affirmed on opinion below 158 F.2d 798 (9 Cir. 1947), certiorari denied 331 U.S. 824, 67 S.Ct. 1315, 91 L.Ed. 1840 (1947); Tiffany & Co. v. Tiffany Productions, Inc., 147 Misc. 679, 264 N.Y.S. 459 (Sup. Ct. 1931), affirmed per curiam with opinion by dissenters 237 App. Div. 801, 260 N.Y.S. 821 (App. Div. 1932), affirmed per curiam 262 N.Y. 482, 188 N.E. 30 (Ct. App. 1933); Sweet Sixteen Co. v. Sweet "16" Shop, Inc., 15 F.2d 920 (8 Cir. 1926); Developments in the Law, supra, at 857. The 1935 agreement between the parties recognized that both of them were doing business in New Jersey and the defendant as the prior user sanctioned use of the name "Sachs" so long as the format of its trade mark was not simulated by plaintiff or an effort made to mislead the public as to a connection between the two companies. Full acceptance of the legal impact of that understanding is undoubtedly responsible for defendant's present position that *85 each of them has the concurrent right to use the family name in business in Newark, despite the fact that it first brought the name to the attention of consumers in northern New Jersey.
Study of all of the circumstances has led us to the conclusion that plaintiff and defendant have the concurrent right to attach the name to their Market Street stores. Prior to coming to Newark, the circulation of plaintiff's trade name seems to have been confined to the locality of its then existing business in Passaic. No proof was adduced to demonstrate that the Newark market was aware of it. However, long before 1939, although defendant was not physically present in that market, its trade name had been pressed into the public consciousness and a large volume of business had been drawn therefrom. Cf. J.B. Liebman & Co. v. Leibman, 135 N.J. Eq. 288, 290 (Ch. 1944). So there is no substantial basis for the suggestion that plaintiff's business name had either prior or exclusive presence in this area, which is the crucial one for purposes of injunctive relief.
Absence of secondary meaning is not dispositive of the matter. Where two persons have the concurrent right to use a name in a similar business, equity will protect each of them against unfair practices on the part of the other in connection with its use. As Judge Jayne pointed out in American Shops, Inc. v. American Fashion Shops, Inc., supra, prevention of unfair competition is not circumscribed by rigid rules. In an era when the struggle in the market place for the favor of the public has become increasingly intense, equity has grown more vigilant in the search for efforts on the part of one competitor to capitalize on the good will of another, to pass off his goods as those of another, or to pirate the trade of his competitor by unfair or deceptive practices. And the pressure of its restraining hand is measured by the degree of the inequitable conduct. The problem confronting us must be analyzed further in the light of these broad considerations.
The proof submitted, in our judgment, does not exhibit to the degree required that defendant changed the name of its Newark store to deceive the public into thinking *86 that they would be dealing with the plaintiff in buying from defendant. Nor does it support the view that defendant in so doing intended or attempted to profit by plaintiff's good will or to pirate its trade. On the contrary, the implication is strong that the possibility of plaintiff benefiting by defendant's presence nearby and its advertising and good will, was a source of concern. Events following the change provided persuasive confirmation for this anxiety, for the vast majority of cases of confusion referred to by plaintiff involved persons who were seeking the defendant.
There can be no doubt that some confusion has arisen because of the proximity of the two stores. Of course, where two persons, each with a legal right to use a common name, compete in the same business, confusion per se, unaccompanied by unfair competition even in the liberal equitable sense in which specific intent to defraud is not always a prerequisite to some relief, is damnum absque injuria. Cf. Rosenthal v. Blatt, 80 N.J. Eq. 90, 93 (Ch. 1912); Andrew Jergens Co. v. Woodbury, Inc., 273 F. 952, 966 (D.C.D. Del. 1921), affirmed per curiam 279 F. 1016 (3 Cir. 1921), certiorari denied 260 U.S. 728, 43 S.Ct. 92, 67 L.Ed. 484 (1922).
However, the confusion has imposed some hardship, inconvenience and annoyance on plaintiff of the type and origin which inevitably sends the sense of equity into a search for a means of relief. In our view, the harsh action of injunction banning the use of the word "Sachs" at defendant's Market Street address is not warranted. Less drastic measures should mark the limits of justifiable equitable intervention. Cf. Mumford Molding Mach. Co. v. E.H. Mumford Co., 88 N.J. Eq. 178, 190 (Ch. 1917).
The trial court awarded the broad injunctive relief described in reliance upon Kafafian v. Spotless Stores of New Jersey, Inc., 141 N.J. Eq. 305 (E. & A. 1948), where the use of the word "Spotless" was restrained. We do not consider the case controlling. There it appeared that since 1929 Kafafian had been engaged in the cleaning and dyeing business in Ridgewood, New Jersey, under the name "Spotless Cleaners & Dyers." Over the front of his store there was a *87 large sign bearing the single word "Spotless" in block letters. The business had been advertised in Ridgewood and the neighboring communities. The service included truck delivery of the customers' goods.
The defendant had a substantial chain of stores which were engaged in cleaning and dyeing and fur storage, shoe repairing, hat cleaning and laundry work. The business was cash and carry; there was no delivery service. Defendant's operations began in New York City in 1923; by 1925 it had 13 shops there. The trade name adopted was "Spotless Dollar Cleaners."
In 1932 a plant was acquired in Edgewater, New Jersey, to do defendant's cleaning and dyeing work in bulk and a store was opened there also. In 1938 this operation was transferred to Paterson.
Defendant began a rapid expansion in New Jersey in 1946 in Bergen and Passaic Counties. A store was opened in Ridgewood about five blocks from that of Kafafian.
The evidence showed defendant dropped the word "Dollar" from its trade name in 1935 and formed a New Jersey corporation entitled "Spotless Stores, Inc." On the front of the Ridgewood store a large sign was placed with the word "Spotless" in block letters. The store was almost identical in appearance with that of Kafafian, except that defendant emphasized its prices by placards in the windows (the prices being lower than the local merchant's because there was no delivery).
The court found that Kafafian was a genuine prior user of the word "Spotless" in the local market in question; that its use there by him had been exclusive and over the years the public in Ridgewood and neighboring communities had come to associate the word with him. Particular significance was attributed to the fact that prior to the opening of defendant's store in the area there had been no competition between them; defendant was unknown there.
A number of factors distinguish that cause from the present one: (1) plaintiff used the name exclusively in the local field; (2) it had acquired a secondary meaning there; *88 (3) defendant was unknown there and had not been in the particular competitive field prior to opening the criticized store; plaintiff's overhead sign and store appearance had been simulated. And so the injunction granted to Kafafian cannot be considered as establishing the bounds of justifiable intervention in this instance.
Our study of the record and examination of the photographs have led us to the conclusion that some relief of the kind set out below would suffice:
(1) The large suspended store front sign which seems to dominate furniture row accentuates the word "Sachs," minimizing the Quality trade mark which is located at the bottom thereof. The trade mark predominates in the marking all over the building, except on this insigne. In our view, it should be changed so as to give equal treatment to both words which primarily distinguish the parties. If the present perpendicular sign is to be continued, the word "Quality" should be carried immediately below "Sachs" in letters of equal size. Of course, this would mean reducing the present size of the letters in "Sachs." Or the sign may be replaced entirely by one in the format of the registered trade mark.
(2) Sufficient emphasis has not been placed on the defendant's address at 51 Market Street. In this connection it is our view that (a) defendant's advertising should carry a cautionary note, such as, "Note the Sachs Quality address: 51 (in heavy type and larger than the remainder of the address) Market Street"; (b) the entrance door of defendant's store should display prominently the same message.
(3) The attention of the public should be drawn more forcibly to the fact that this store is one of the Sachs Quality chain, the only one in Newark, and that it is not connected with any other Newark establishment bearing the name Sachs. Such notice ought to appear also in all publicity as well as on the entrance door.
We have not attempted to specify the exact details for the accomplishment of the remedial steps suggested. Enough has been said to indicate their general scope. The precise form they should take can be worked out by the parties and *89 the agreement reached by them may be presented to us for inclusion in a special form of mandate. If an impasse arises, the matter may be brought to our attention on motion.
In view of the conclusion reached, it is not necessary to consider the federal questions raised by defendant which were not advanced in the Chancery Division. Further, since the parties at oral argument conceded that the cause was tried on the merits in the trial court and that we should decide the issues on the record made there, the suggested limiting effect of the pretrial order has been disregarded.
The judgment is modified accordingly.